STATE OF NORTH CAROLINA v. WILLIE JUNIOR LLOYD

No. 196A00

(Filed 5 October 2001)

## 1. Evidence— prior crimes or acts—assault with a deadly weapon with intent to kill inflicting serious injury

The trial court did not abuse its discretion in a capital first-degree murder prosecution by admitting evidence of the circumstances leading to defendant's 1991 conviction for assault with a deadly weapon with intent to kill inflicting serious injury under N.C.G.S. § 8C-1, Rule 404(b), because: (1) the evidence was admissible to show lack of accident, motive, common plan or scheme and intent; (2) the probative value of the evidence outweighed any unfair prejudice; (3) the prior incident was not too remote in time when defendant spent part of the time between 1991 and 1998 in jail; and (4) the trial court followed the pattern instruction which was in substantial conformity with defendant's requested instruction as to the "other crimes" evidence.

## 2. Evidence— victim's prior violent acts—threats—statements she killed another man

The trial court did not err in a capital first-degree murder prosecution by excluding evidence relating to the victim's threats and statements to defendant that the victim had killed another man and gotten away with it, because: (1) evidence of the victim's prior violent act is not relevant to the killing of the victim in the absence of evidence that defendant shot the victim in self-defense; (2) the evidence was irrelevant and inadmissible under N.C.G.S. § 8C-1, Rule 404(b) when defendant claimed he never intentionally shot the victim and that the shooting was accidental; (3) the State's cross-examination of defendant did not open the door to this evidence; and (4) the rule of completeness under N.C.G.S. § 8C-1, Rule 106 did not entitle defendant to introduce the portion of his statement to the police indicating that the victim had told him she killed another man and got away with it when defendant did not seek to introduce the excluded parts of his police statement contemporaneously as required by statute, but instead sought to introduce them on rebuttal.

STATE v. LLOYD

[354 N.C. 76 (2001)]

**3. Evidence— photographs of victim—victim's bloodstained shirt**

The trial court did not abuse its discretion in a capital first-degree murder prosecution by admitting four photographs of the victim's front porch showing a pool of blood and the victim's bloodstained shirt, five photographs of the victim's bloodstained shirt marked with bullet holes, and the victim's bloodstained shirt, because: (1) the photographs were introduced for the limited purpose of illustrating witness testimony; (2) the photographs were relevant under N.C.G.S. § 8C-1, Rules 401 and 402 for the purpose of allowing the jury to understand the witness's testimony and for corroborating the State's case; (3) the photographs were not unnecessarily gory, inflammatory, or excessive; and (4) the victim's shirt was relevant to illustrate a witness's testimony and to corroborate the State's case.

**4. Evidence— hearsay—prior consistent statement— corroboration**

The trial court did not err in a capital first-degree murder prosecution by allowing a police officer to testify as to what the victim's six-year-old grandson told the officer shortly after the victim's murder, because: (1) prior consistent statements are admissible even though they contain new or additional information so long as the narration of events is substantially similar to the witness's in-court testimony; (2) the testimony of the officer was admitted for the limited purpose of corroborating the child's testimony; and (3) even if any of the statements did not corroborate the child's trial testimony, their admission was not prejudicial when numerous witnesses gave similar testimony.

**5. Evidence— defendant's demeanor after arrest—relevancy—lay opinion**

The trial court did not abuse its discretion in a capital first-degree murder prosecution by admitting testimony of two of the State's witnesses concerning defendant's demeanor as calm at the time of his arrest within an hour of shooting the victim, because: (1) the testimony was relevant under N.C.G.S. § 8C-1, Rule 401 since it tended to negate defendant's claim that the shooting was accidental and shed light on both the circumstances of the murder and on defendant's intent and state of mind at the time of the offense; (2) the probative value of the testimony was not substantially outweighed by unfair prejudice, N.C.G.S. § 8C-1, Rule 403; and (3) the lay testimony was based upon the investigators'

personal observations of defendant for a period of time and was helpful to a clear understanding of whether defendant acted with intent or whether the shooting was an accident, N.C.G.S. § 8C-1, Rule 701.

**6. Evidence— expert testimony—victim's four wounds—pain**

The trial court did not err in a capital first-degree murder prosecution by allowing a pathologist to testify that each of the victim's four wounds would have been painful, because: (1) expert testimony concerning the pain and suffering of the victim in a first-degree murder case is relevant and admissible to assist the jury in ascertaining whether defendant was acting with premeditation and deliberation and to rebut defendant's claim of accident; (2) the State properly used the testimony as a basis for its argument that if the victim had her hand on the gun as defendant contended, it was unlikely that she would have kept it there during four separate shots that caused her pain; and (3) the statements concerning the victim's pain were not unfairly prejudicial in light of other testimony about the victim's pain.

**7. Criminal Law— prosecutor's argument—hope you are not a victim in a criminal case—police do the best they can to fight crime—defendant's characterization of shooting—biblical reference**

The trial court did not abuse its discretion in a capital first-degree murder prosecution by allowing the State to argue during closing arguments that "you better hope you're not a victim in a criminal case," "the police do the best they can to fight crime," "defendant's characterization of the shooting was the most preposterous accident that has ever happened," and by citing the biblical reference of the "Dance, Death" poem, because: (1) the State did not urge the jurors to put themselves in the place of the victim; (2) the prosecutor was defending the tactics of the police department; (3) the prosecutor did not improperly state his personal opinion; and (4) the remarks in the poem did not suggest that the law enforcement powers of the State were divinely ordained or inspired by God, nor did they suggest that to resist such powers is to resist God.

**8. Criminal Law— jury instruction—flight—determination of guilt**

The trial court did not err in a capital first-degree murder prosecution by instructing the jury that it could consider evi-

dence of flight in determining defendant's guilt, because: (1) there was testimony from numerous witnesses that defendant hurriedly left the scene of the murder without providing medical assistance to the victim; and (2) the fact that there may be other reasonable explanations for defendant's conduct does not render the instruction improper.

**9. Sentencing— capital—aggravating circumstance—especially heinous, atrocious, or cruel murder—insufficient evidence**

The trial court erred in a capital sentencing proceeding by submitting to the jury the statutory aggravating circumstance under N.C.G.S. § 15A-2000(e)(9) that the murder was especially heinous, atrocious, or cruel, and defendant's sentence of death is vacated, because: (1) the victim's death was relatively rapid; (2) being shot more than one time does not by itself necessarily make a death especially physically agonizing to an extent sufficient to support the submission of this circumstance; (3) the victim's death was not dehumanizing when no family members witnessed the actual shooting and the victim's time of consciousness afterwards was relatively short; (4) the victim did not suffer psychological torture when there was no evidence the victim was aware that she was going to be killed until defendant shot her; and (5) the facts fail to demonstrate that defendant showed an unusual depravity of the mind.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Allen (J.B., Jr.), J., on 23 July 1999 in Superior Court, Alamance County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 15 May 2001.

*Roy A. Cooper, Attorney General, by Joan M. Cunningham, Assistant Attorney General, for the State.*

*Staples Hughes, Appellate Defender, by Danielle M. Carman, Assistant Appellate Defender, for defendant-appellant.*

EDMUNDS, Justice.

On 19 October 1998, defendant Willie Junior Lloyd was indicted for the first-degree murder of Cynthia Catherine Woods. He was tried capitally before a jury at the 28 June 1999 Special Criminal Session of Superior Court, Alamance County. On 20 July 1999, the jury found

defendant guilty of first-degree murder on the basis of malice, pre-meditation, and deliberation. Following a capital sentencing pro-ceeding, the jury recommended a sentence of death, and on 23 July 1999, the trial court entered judgment in accordance with the recom-mendation. Defendant appeals to this Court as a matter of right. For the reasons that follow, we find no prejudicial error in the guilt-inno-cence phase of defendant's trial, but we vacate the death sentence and remand the case for a new capital sentencing proceeding.

The evidence at trial established that defendant was involved in a romantic triangle with victim Woods. Defendant had been seeing Woods for several years. However, she was living with another boyfriend, William Coltraine, whom she had been dating for fourteen years. At the time of the murder, Woods was attempting to terminate her relationship with defendant. Freddie Woods, the victim's son, who was twenty-six years old at the time of trial and lived at the vic-tim's home, testified that his mother "was trying to break everything off" with defendant. Woods told Freddie that she had obtained a restraining order against defendant and had changed her telephone number as a result of defendant's calls. Woods frequently asked Freddie to tell defendant that she was asleep or not home if defend-ant telephoned her. Coltraine testified that in 1995, defendant was charged with placing harassing telephone calls to Woods' residence and with second-degree trespass at Woods' residence, and a judge ordered defendant "not to call back at the house and also not to come on our property anymore." Coltraine also stated that if he told defendant that Woods was asleep when defendant telephoned her, defendant would instruct him to "tell the bitch I called."

On 28 September 1998, Woods was at home with Freddie. When defendant telephoned in the late morning, Woods asked Freddie to tell defendant that she was asleep. That afternoon, Woods left home to pick up from school her five-year-old grandson, Jovanta Woods. Defendant called again for Woods while she was gone. After Woods and Jovanta returned, Jovanta began his homework in the kitchen, and Freddie watched television in his bedroom. At approximately 3:00 p.m., defendant went to Woods' home. Jovanta heard a doorbell ring and heard Woods and defendant step into the house and begin arguing. He then heard two loud bangs and went to the front porch, where he saw Woods lying on the porch. Freddie also heard a "loud banging" and went outside to find Woods lying on the porch in a pool of blood. She was bleeding from her nose and mouth, her body was flinching, and her right foot was under the storm door. Freddie saw

defendant running toward his car. Defendant stopped to look back at Freddie, then entered his car and drove away "extremely fast." Jovanta also observed defendant drive away quickly from the scene. Freddie ran after defendant's car in an attempt to determine his license plate number, then returned to the porch and called for emergency assistance. Freddie asked Woods if she knew defendant's last name, and she was able to respond that it was "Willie Lloyd." Freddie relayed this information to police and also described defendant's vehicle.

Several witnesses who worked at the Annedeen Hosiery Mill across from Woods' residence observed defendant and Woods on 28 September 1998. Gene Terrill testified that as he left Annedeen at approximately 3:06 p.m., he observed Woods partially inside her house, yelling at defendant to "[g]et the hell out of here." Defendant's hand was on the door at the time. Terrill heard the arguing become louder, followed by a shot. He saw Woods grab the door. As she fell, defendant rapidly fired additional shots at her while yelling "bitch" in an angry tone. Defendant then looked at Terrill and quickly moved toward his car, driving off at a "very fast rate." Terrill went to the porch and saw Woods flinching and bleeding from her ears, nose, and mouth. Terrill saw both Jovanta crying on the porch and Freddie running after defendant's car.

Tim Guffey, also an employee with Annedeen, left work shortly after 3:00 p.m. When he heard two gunshots, he approached Woods' home, where he saw

a guy running down the steps towards his car. And then he slammed the door. And he took off real fast, you know. He was fish tailing down the street. . . . Looked like he was going to wipe the side of the street out on both sides, you know, the way he was going.

He added that defendant did not stop at a stop sign as he drove away. Guffey also saw Jovanta crying on the porch while Freddie knelt over Woods with a telephone in his hand, and observed Woods flinching and bleeding from the mouth.

Katie Poole, another Annedeen employee, was waiting for her husband at the shipping dock. She noticed defendant on Woods' porch. Woods, who was behind her storm door, yelled at defendant to "[g]et the hell away from here." Shortly afterwards, Poole heard more than four gunshots and heard a car "spinning off, like tires were hol-

lering." She also observed Jovanta and Freddie on the front porch after the shooting. Similarly, Mike Long, a neighbor of Woods, heard five to six gunshots shortly after 3:00 p.m. and then "heard somebody take-off squeeling [sic] tires a little bit."

When emergency personnel arrived on the scene, Woods' breathing was labored, and she appeared to be unconscious. Her shirt, on which bullet holes and powder burns could be seen, was cut from her body to facilitate CPR. Woods apparently died before she reached the hospital.

As defendant fled the scene, he passed an automobile driven by Jason McPherson, who testified that defendant was "going around two lanes of traffic on the wrong side of the street, and through an intersection, which about hit me in the process." Defendant drove to Culp Weaving where Coltraine, his rival for the victim's affections, had just gotten off work. Coltraine, who was talking with Tim and Wayne Crutchfield in the parking lot, testified that defendant approached the men and calmly stated,

> I'm pretty sure you don't know me do you? . . . Well, I'm the guy that y'all tried to have locked up one time. . . . I was man enough to come by and tell you that I had killed Catherine, and she's laying over there on the porch. Maybe you better go on home. Maybe you better go on home.

Defendant also told Coltraine, "I did come to kill both of you." Tim Crutchfield similarly testified that defendant approached the men in the parking lot and stated to Coltraine, "[Y]ou don't know who I am, but I just shot Cathy. . . . She's laying on the porch. You might ought to go check on her. She's dead." Wayne Crutchfield testified that defendant approached the three men in the parking lot and stated, "I know you all don't know me. . . . She's laying on the porch." Wayne Crutchfield also heard defendant say that he was going to turn himself in.

After leaving Culp Weaving, defendant drove to a convenience store to buy a soft drink. He called the Burlington Police Department at 3:26 p.m., identified himself, and told police he would turn himself in. He added, however, that he first needed to drive around for half an hour to clear his head because "after something like this, you are just not in the state of mind that you're used to," and requested that an officer meet him at his residence. Defendant next drove to another convenience store where he purchased cigarettes and another soft

drink and called his mother to tell her that Woods was hurt. He then drove home, where Detective Tye Fowler of the Burlington Police Department and Lieutenant Eddie Sheffield of the Alamance County Sheriff's Department arrested him and charged him with murder. Defendant was calm and cooperative, and he appeared to be uninjured. Lieutenant Sheffield retrieved a .380-caliber semiautomatic handgun, a magazine, and loose rounds of ammunition from inside defendant's residence.

Dr. John Butts, Chief Medical Examiner for the State of North Carolina, performed an autopsy of Woods. He testified that she suffered four bullet wounds. One wound was to her left breast, another was to her right shoulder, a third was to her lower right shoulder, and a fourth was to her lower abdomen. The shot that struck the victim's breast was fired at such a close range that Dr. Butts stated, "[T]he muzzle of the gun in my opinion was up against her body at the time it was discharged." Although at least two of the wounds were not individually fatal, all of the shots would have caused painful injuries and collectively were the cause of death. Dr. Butts testified that the shot to her lower right shoulder, which was fired from behind and above and penetrated several vital organs, was "rapidly, relatively rapidly, fatal," suggesting that this wound was the immediate cause of death. Dr. Butts also stated that, depending on the relative positions of the shooter and the victim, the wounds could have been inflicted by someone who was standing above Woods and that the wounds on the front of her body were somewhat inconsistent with her standing upright. He detected a powder deposit on Woods' right wrist, which was consistent with a defensive gesture. Eugene Bishop, a special agent with the North Carolina State Bureau of Investigation, testified that three projectiles retrieved from Woods' body and a fourth projectile and six shell casings retrieved from the scene of the crime had all been fired from the .380-caliber semiautomatic pistol seized from defendant's home at the time of his arrest.

The State also introduced evidence of a prior assault by defendant on Ronnie Turner in 1991. Turner testified that in August of that year he ended a relationship with Darlene Baldwin, a co-worker who was also involved romantically with defendant. After finishing work on 27 August 1991, Turner stopped at a convenience store on his way home. As he was stepping out of his car, defendant pulled up alongside and fired five shots. Four of the shots hit Turner in his lower abdomen, and the fifth struck the rear glass of Turner's car. Phil Ayers, a lieutenant with the Alamance County Sheriff's Department,

testified that defendant called police on the day of the shooting to turn himself in. Defendant told Lieutenant Ayers that Turner had been dating his girlfriend, and he decided to take the matter "in his own hands." He waited for Turner to leave work, followed him to the convenience store, then started shooting with a .380-caliber pistol. He fired four to five times because he knew one or two shots missed Turner. As a result of this incident, defendant pled guilty to assault with a deadly weapon with intent to kill inflicting serious bodily injury.

After the State rested its case-in-chief, defendant testified on his own behalf. He stated that he met Woods in May 1993 when they worked together and that, shortly thereafter, they began dating. He claimed that he gave Woods $35,000 in cash to purchase a house in Alabama where they would live together, worked on her vehicle on many occasions, and paid a number of her bills. They frequently took trips together to Alabama, Virginia, and cities in North Carolina. Woods also called defendant once or twice a day. However, defendant also testified that he and Woods had several altercations and that he feared her. Although Woods charged defendant with harassing telephone calls and second-degree trespass in April 1995, defendant claimed he was acquitted on the telephone charge and received a prayer for judgment continued on the trespass charge. He continued to go about Woods' premises, and Woods gave defendant her new telephone number the day after the court hearing. Defendant thereafter made Woods the beneficiary of his life insurance. In addition, defendant testified that he spoke with Coltraine about his relationship with Woods, and Coltraine threatened him both at home and work. Because of these threats, defendant and Woods purchased a .380-caliber handgun approximately two years before the shooting.

A week before Woods was killed, she telephoned defendant and expressed irritation with him because the alternator he installed in her car was causing a fire. Defendant also spoke with Woods on 24 September 1998 and 26 September 1998. On 28 September 1998, defendant called Woods' house at approximately 9:00 a.m., but Freddie told him that Woods was not there. When he called again around 2:30 p.m., Woods was upset. Defendant obtained permission from his supervisor, Darren Yancey, to leave work early to pick up Woods and also to pick up Jovanta from school. At trial, Yancey corroborated this portion of defendant's testimony.

Defendant testified that he kept his pistol at work as protection from Coltraine. He stated that on the day of the shooting he put the

pistol in his pocket as he left work to pick up Woods, but also stated that he was in such a hurry that he did not realize he was carrying the gun in his pants when he arrived at her home. He rang Woods' doorbell, and she came outside and "smack[ed him] in the face with a book." She was upset about her car. Defendant grabbed Woods' hands so that she would stop hitting him, but when he let go she punched him in the face. Woods then told defendant, "I got something for your mother f——— a—," and ran into her home. Defendant attempted to sit down on the front steps, but Woods emerged from her house and hit defendant in the head with an object. Defendant, fearing that Woods had a weapon, remembered "I had the gun on me. So, I just reached on my side and pulled it out." Defendant told Woods, "[S]ee what I got in my hand." Although defendant never pointed the gun at Woods, she grabbed it with both hands and twisted defendant's arms. As a result, defendant was "leaning all the way back. I never could get up on my foot." The gun fired one time and then three more times in rapid succession. Defendant fell to the porch, and the gun dropped out of his and Woods' hands. Defendant never saw any blood on the victim, nor did he notice Freddie or any of the employees from Annedeen. He checked Woods' pulse and observed that she was not breathing. He looked into the house, but did not see a telephone, so he went to his car and drove away. He went to Culp Weaving to tell Coltraine that he had an emergency at home, then called police to turn himself in.

On cross-examination, the State confronted defendant with inconsistencies between his trial testimony and statements he made to Detectives Mike Fuquay and Tye Fowler of the Burlington Police Department after being arrested and signing a waiver of his *Miranda* rights on 28 September 1998. Defendant denied telling the detectives the following at the time of his arrest: that he and the victim never struck each other during their relationship; that he had been trying to talk to the victim for several days before her murder, and she refused his telephone calls; that during one telephone conversation on 28 September 1998, the victim told defendant not to call her anymore and hung up on him; that during this conversation, defendant told the victim that he was coming to her house, and she told him not to come; that he went to the victim's house and saw that her car was gone and went to a telephone booth to call her house; that Freddie answered the phone and told him that the victim was picking up Jovanta from school; that when defendant went back to the victim's residence, her car was in the yard; that the victim told him that she did not want to talk to him; that he turned around to leave; and that the victim said,

"Get the f— out of here," or "Go the hell on." Defendant also claimed that he told the detectives that Woods had come out onto the porch and hit him with a book, but that the detectives did not write down that statement. When the prosecutor asked if defendant told the detectives that he shot Woods "out of instinct," defendant responded, "I told him I pulled the gun out of instinct of her coming outside knowing I didn't know what she had in her hand."

Although defendant contended that the case had aspects of self-defense, the trial court made findings that defendant shot the victim four times with a pistol he brought on the premises; testified he never pointed the weapon at the victim, but the victim grabbed the weapon; and testified both he and the victim had a finger on the trigger when the gun discharged. Based on these findings, the court concluded that there was no evidence of self-defense and advised defendant that he would not instruct the jury on self-defense. We agree with the trial court's analysis and conclusion.

GUILT-INNOCENCE PHASE

I.

[1] Defendant first contends that the trial court erred in admitting evidence of the circumstances leading to defendant's 1991 conviction for assaulting Ronnie Turner with a deadly weapon with intent to kill inflicting serious injury. The trial court admitted this evidence pursuant to Rule 404(b) of the North Carolina Rules of Evidence. Defendant argues that the evidence was irrelevant under Rule 404(b), and in the alternative, even if the evidence was relevant, its probative value was substantially outweighed by the danger of unfair prejudice under Rule 403. Defendant additionally alleges this "other crimes" evidence violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 19, 23, 24, and 27 of the North Carolina Constitution. Finally, defendant contends that the trial court erred in denying his requested jury instructions about the permissible uses of the evidence.

We digress briefly to discuss defendant's constitutional claims. He has alleged constitutional violations for each assignment of error raised in his brief. In several instances, however, defendant failed to preserve the constitutional issue at trial and has provided no argument and cited no cases in support of his constitutional arguments. Constitutional issues not raised and passed upon at trial will not be

considered for the first time on appeal. *State v. Benson*, 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988). Accordingly, we will address only those issues that were properly preserved. Although defendant did make a constitutional objection pertaining to admission of Rule 404(b) evidence, because he does not provide argument or cite any cases in support of the alleged constitutional violations in his brief, we will consider only his arguments based on statutes or the rules of evidence. "Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned." N.C. R. App. P. 28(b)(5).

Prior to trial, defendant filed a motion to exclude evidence or testimony of misconduct or other crimes, asserting that introduction of such evidence would be highly prejudicial and inflammatory. The trial court deferred ruling on the motion until trial, and at trial conducted a *voir dire* regarding the evidence of defendant's assault on Turner. During the *voir dire* conducted in the absence of the jury, the trial court heard testimony of Ronnie Turner and Lieutenant Phil Ayers of the Alamance County Sheriff's Department. Turner testified that in early August 1991, he ended a sexual relationship with defendant's live-in girlfriend, Darlene Baldwin. On 27 August 1991, Turner drove to a convenience store after leaving work. As he emerged from his car, defendant "pulled up real fast" in his car, shot Turner four times, then drove away.

Lieutenant Ayers' *voir dire* testimony was more detailed than his later trial testimony. He stated on *voir dire* that he had interviewed defendant shortly after defendant shot Turner. Defendant believed the relationship between his girlfriend and Turner had ended, but he still "wasn't satisfied with the situation." After arming himself with a .380-caliber semiautomatic pistol, defendant waited for Turner to leave work and followed him to a convenience store. Defendant told Lieutenant Ayers he "figured" Turner had a gun (a .22-caliber pistol was recovered under the driver's seat of Turner's automobile) and that when he saw a passenger in Turner's vehicle reach for something, he shot Turner. Defendant added that he only wanted to scare Turner. After the shooting, defendant returned home and told Baldwin, "I done shot your boyfriend, so go over there and see." He also told Baldwin, "I should go ahead and get you, I would kill you now, but you have grandchildren and I don't want to kill you on account of them." Defendant thereafter surrendered to police.

At the conclusion of the *voir dire*, the trial court issued a detailed order, ruling that this "other crimes" evidence was admissible under

Rule 404(b) to show absence of accident, motive, plan, and intent, but not preparation or knowledge. The trial court also found that the evidence was relevant under Rule 401 and that its probative value substantially outweighed any unfair prejudice to defendant under Rule 403. Defendant then requested that the trial court instruct the jury that it "may not consider this evidence in order to show that the defendant acted in conformity." The trial court instead instructed the jury in accord with the pattern instruction, N.C.P.I.—Crim. 104.15 (1984), informing the jury about the purposes for which the evidence could be considered and instructing the jury that it could "not convict [defendant] on the present charge because of something he may have done in the past."

Rule 404(b) provides:

>    (b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1999). We have held that Rule 404(b) is a

>    clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.

*State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). Accordingly, " 'evidence of other offenses is *admissible* so long as it is *relevant to any fact or issue other than* the character of the accused.' " *State v. Weaver*, 318 N.C. 400, 403, 348 S.E.2d 791, 793 (1986) (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 91 (1982)) (emphasis added), *quoted in State v. Coffey*, 326 N.C. at 278, 389 S.E.2d at 54. In addition to the requirement that the evidence be offered for a purpose other than to show criminal propensity, "[t]he admissibility of evidence under [Rule 404(b)] is guided by two further constraints—similarity and temporal proximity [of the acts]." *State v. Lynch*, 334 N.C. 402, 412, 432 S.E.2d 349, 354 (1993). The evidence of defendant's assault on Turner met all requirements for admissibility under Rule 404(b).

## A. ABSENCE OF ACCIDENT

In the case at bar, defendant testified that the shooting was accidental and that he did not intend to shoot the victim. We have held that "[w]here, as here, an accident is alleged, evidence of similar acts is more probative than in cases in which an accident is not alleged." *State v. Stager*, 329 N.C. 278, 304, 406 S.E.2d 876, 891 (1991) (evidence that defendant fatally shot her first husband admissible in trial of defendant for the fatal shooting of her second husband under similar circumstances). Indeed, "[t]he doctrine of chances demonstrates that the more often a defendant performs a certain act, the less likely it is that the defendant acted innocently." *Id.* at 305, 406 S.E.2d at 891.

> "The recurrence or repetition of the act increases the likelihood of a mens rea or mind at fault. In isolation, it might be plausible that the defendant acted accidentally or innocently; a single act could easily be explained on that basis. However, in the context of other misdeeds, the defendant's act takes on an entirely different light. The fortuitous coincidence becomes too abnormal, bizarre, implausible, unusual, or objectively improbable to be believed. The coincidence becomes telling evidence of mens rea."

*Id.* (quoting Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 5:05, 1011 (1984)).

The similarities between the instant shooting and defendant's assault on Turner are striking: (1) both situations involved a love triangle consisting of two men and one woman; (2) in both instances defendant sought out the victims armed with a .380-caliber pistol; (3) in both cases defendant claimed he drew his pistol only in response to a perceived threat; (4) defendant shot both victims multiple times and shot each victim in the abdomen; (5) both shootings occurred during daylight hours; (6) defendant quickly fled both crime scenes in his own car; (7) defendant immediately went to the other party in the love triangle, related what he had done to the victim, and added that he had contemplated killing the other party as well; and (8) shortly after committing each crime, defendant voluntarily turned himself in to police. Based on this evidence, we hold that the trial court properly admitted the evidence to show lack of accident.

## B. MOTIVE

The evidence was also relevant to show defendant's motive. "[T]he State may also introduce [other crimes] evidence if it is relevant to establish a pattern of behavior on the part of the defendant

tending to show that the defendant acted pursuant to a particular motive." *Id.* at 306-07, 406 S.E.2d at 892; *see also State v. White,* 349 N.C. 535, 552, 508 S.E.2d 253, 264 (1998) ("[E]vidence of defendant's acts of violence against [the witness], even though not part of the crimes charged, was admissible since it ' "pertain[ed] to the chain of events explaining the context, motive and set-up of the crime" ' and ' "form[ed] an integral and natural part of an account of the crime . . . necessary to complete the story of the crime for the jury." ' *State v. Agee,* 326 N.C. 542, 548, 391 S.E.2d 171, 174-75 (1990) (quoting *United States v. Williford,* 764 F.2d 1493, 1499 (11th Cir. 1999))"), *cert. denied,* 527 U.S. 1026, 144 L. Ed. 2d 779 (1999). In both shootings, there was strong evidence suggesting defendant acted out of jealousy. In the case at bar, proof of motive was significant in light of defendant's testimony that he had a good relationship with the victim prior to her death.

## C. COMMON PLAN OR SCHEME AND INTENT

Finally, " '[e]vidence of other offenses is admissible if it tends to show the existence of a plan or design to commit the offense charged, or to accomplish a goal of which the offense charged is a part or toward which it is a step.' " *State v. Stager,* 329 N.C. at 307, 406 S.E.2d at 892 (quoting *State v. Barfield,* 298 N.C. 306, 329, 259 S.E.2d 510, 529 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137 (1980)). Evidence of other crimes does not have to show the existence of a "common plan" as defendant argues. Where a defendant claims accident, a prior bad act with a "concurrence of common features" to the crime charged, *State v. Barfield,* 298 N.C. at 329, 259 S.E.2d at 530, tends to negate a defendant's contention that he "had *no plan* to shoot [the victim]," *State v. Stager,* 329 N.C. at 304, 406 S.E.2d at 891. *See, e.g., State v. Murillo,* 349 N.C. 573, 594, 509 S.E.2d 752, 764 (1998), *cert. denied,* 528 U.S. 838, 145 L. Ed. 2d 87 (1999). Defendant's *modus operandi* in each of the two shootings was sufficiently similar to permit a finding that evidence of the prior shooting was relevant to show that defendant had a plan or design to shoot the victim in the case at bar. This analysis also applies to demonstrate that the evidence was admissible to show defendant's intent to shoot the victim.

Despite the above finding, evidence of the 1991 assault on Turner may nevertheless have been excluded if its probative value was substantially outweighed by the danger of unfair prejudice. N.C.G.S. § 8C-1, Rule 403 (2001). The determination of whether to exclude

such evidence is a matter left to the sound discretion of the trial court, and its determination will not be disturbed on appeal absent an abuse of discretion. *State v. Stager*, 329 N.C. at 308-09, 406 S.E.2d at 893-94. In this case, the trial court admitted the evidence of defendant's 1991 assault on Turner for the limited purposes of proving absence of accident, motive, plan, and intent. The trial court also found that the probative value of the evidence outweighed any unfair prejudice to defendant. We cannot say that the trial court abused its discretion in its holding.

We next address defendant's contention that the shooting of Turner was too remote in time to show absence of accident, motive, plan, and intent in the case at bar. Defendant shot Turner in 1991 and Woods in 1998. The record indicates that defendant received a six-year sentence for assaulting Turner with a deadly weapon with intent to kill inflicting serious bodily injury and, in 1993, received a three-year active sentence for assaulting Darlene Baldwin with a deadly weapon inflicting serious injury. "It is proper to exclude time defendant spent in prison when determining whether prior acts are too remote." *State v. Berry*, 143 N.C. App. 187, 198, 546 S.E.2d 145, 154, *disc. rev. denied*, 353 N.C. 729, 551 S.E.2d 439 (2001); *see also State v. Riddick*, 316 N.C. 127, 134, 340 S.E.2d 422, 427 (1986). Although the record does not show the precise dates of defendant's incarceration, there is no doubt that he spent part of the time between 1991 and 1998 in jail. Moreover, remoteness in time can become significant when the evidence of the prior crime is introduced to show that both crimes "arose out of a common scheme or plan. In contrast, remoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident; remoteness in time generally affects only the weight to be given such evidence, not its admissibility." *State v. Stager*, 329 N.C. at 307, 406 S.E.2d at 893 (citation omitted). Even so, in considering whether earlier events are admissible to show a plan, we can take into account the unusual similarities between the instances. *State v. Penland*, 343 N.C. 634, 654, 472 S.E.2d 734, 745 (1996) ("Given the commonality of the distinct and bizarre behaviors, the ten-year gap between the incidents did not 'negate[] the plausibility of the existence of an ongoing and continuous plan to engage . . . in such . . . activities.'") (quoting *State v. Shane*, 304 N.C. 643, 656, 285 S.E.2d 813, 821 (1982), *cert denied*, 519 U.S. 1098, 136 L. Ed. 2d 725 (1997)). Accordingly, we hold that the evidence of defendant's 1991 shooting of Turner and subsequent conviction was not so remote in time as to make it inadmissible. *See State*

*v. Murillo*, 349 N.C. at 596, 509 S.E.2d at 766 (twenty-two years not too remote); *State v. Riddick*, 316 N.C. at 134, 340 S.E.2d at 427 (six years not too remote).

Finally, we address defendant's contention that the trial court erred in failing to give his requested instruction as to the "other crimes" evidence. We consistently have held that " 'a trial court is not required to repeat verbatim a requested, specific instruction that is correct and supported by the evidence, but that it is sufficient if the court gives the instruction in substantial conformity with the request.' " *State v. McNeill*, 346 N.C. 233, 239, 485 S.E.2d 284, 288 (1997) (quoting *State v. Brown*, 335 N.C. 477, 490, 439 S.E.2d 589, 597 (1994)), *cert. denied*, 522 U.S. 1053, 139 L. Ed. 2d 647 (1998). Here, the trial court followed the pattern instruction, which was in substantial conformity with defendant's request. We previously have rejected a virtually identical argument in *State v. Burr*, 341 N.C. 263, 292, 461 S.E.2d 602, 617-18 (1995), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996). These assignments of error are overruled.

II.

[2] Next, defendant argues that the trial court erred in excluding relevant and admissible defense evidence relating to the victim's threats and statements to him that she had killed another man and "got[ten] away with it." On appeal, defendant contends that evidence of these threats and statements was admissible under Rules 401 and 402 of the North Carolina Rules of Evidence, admissible on redirect examination because the State opened the door to the evidence on cross-examination, admissible under Rule 106 of the North Carolina Rules of Evidence, admissible as nonhearsay or under the state-of-mind or catchall exceptions to the hearsay rule, and admissible as corroborative evidence. Although defendant made a constitutional objection to this evidence at trial and raises constitutional violations in his appeal, he failed to provide argument or cite cases in support of the constitutional violations in his brief. Accordingly, as noted above, our review is limited only to those arguments based on statutes or rules of evidence.

After the State rested and before defendant gave his opening statement or presented evidence, the State made a motion *in limine* to prevent defendant from telling jurors in his opening statement that the victim had stated to him that she had killed a man and gotten away with it. The trial court instructed defendant not to mention that

evidence in opening statements or until the court "hears that fully and rules on whether or not that's admissible." Defendant objected.

Subsequently, defendant testified in his own defense, and the trial court conducted a *voir dire* to determine if he could testify to the evidence. On *voir dire*, defendant stated:

Q. Did she ever threaten you?

A. Yes, sir.

Q. And tell the, tell the Court about that.

A. Well, she said if she ever caught me messing around on her, she would kill me.

Q. How many times was that?

A. I say about twenty.

Q. Was she a violent person?

A. I would say she was, yes.

Q. And on what do you base that statement? What do you base that statement on?

A. Well, just like I said if she don't, if you don't do what she say, she can get very violent with you.

Q. While the jury is out, Your Honor, had she ever told you anything about killing someone before?

A. Yes, she have [sic].

Q. Tell the Judge about that.

A. She said she had killed some guy named Ricky Wade.

Q. Did she tell you how she did it?

A. She told me several different ways she said she did it.

Q. Well, did she tell you whether she used a gun or knife or what?

A. She said she used a gun and a knife in one of the occasions.

Q. Did she tell you when that happened?

A. No, she never did state a date to when it happened.

STATE v. LLOYD

[354 N.C. 76 (2001)]

Q. Did she say anything to you about whether she didn't get away with it, got away with it?

A. Well, she said she got away with it and she could do it again.

Q. When would she tell you that?

A. Mostly when she got angry for something I didn't do for her.

Q. Did you, did you believe her?

A. Yes, I did.

Defendant's counsel argued that the evidence was "not being offered for the truth thereof. It's being offered to explain his actions, to explain his state of mind, to explain as to the reasonableness of his belief that his actions were warranted in pulling his firearm that you'll hear about later." The trial court ruled that defendant could not testify as to Woods' statements about Ricky Wade.

On cross-examination, the State questioned defendant about inconsistencies in his trial testimony and statements he made to Detectives Mike Fuquay and Tye Fowler at the time of his arrest. On redirect, defendant's counsel then asked defendant, "Did you tell Officer Fuquay that Catherine Woods had threatened to kill you and—[?]" The State interrupted with an objection, and defendant argued that the State had opened the door to such question on cross-examination, contending that the State "should not be allowed to put before this jury what they perceive to be the favorable portions of [defendant's] statement to the police, without us being allowed to cross examine or redirect [defendant] about the points that we would like to have the jury consider." The trial court stated that it had reviewed the portion of defendant's testimony from the previous session (his testimony covered two days). Based on that transcript and the court's recollection, the court did not believe that the State had asked defendant on cross-examination what he told the police as to what the victim had said, and therefore did not open the door to such questioning. Our independent review of the transcript reveals that the trial court's recollection was accurate.

The trial court nevertheless allowed defendant to present additional *voir dire* testimony on the issue. During the *voir dire*, defendant testified again about Woods' statements to him that she had killed Ricky Wade. Dexter Lowe, a sergeant with the Burlington Police Department, also testified during the *voir dire* that he investigated

the shooting of Ricky Wade on 10 June 1984. Sergeant Lowe stated that Woods and Wade were dating and that Woods shot and killed Wade after Wade assaulted her, although Woods only meant to scare Wade. Sergeant Lowe also testified that Woods was charged with first-degree murder, but the grand jury failed to return an indictment.

After the *voir dire*, the trial court entered an order precluding defendant from testifying as to Woods' statements to him about Wade's death. The trial court made numerous findings of fact to support its exclusion of the evidence, including: (1) defendant's statements to police that the victim told defendant about the Wade killing were irrelevant and unduly prejudicial, (2) the State never opened the door to admit evidence of the Wade killing, and (3) the jury would not be instructed on self-defense because defendant testified he neither pointed his gun at the victim nor fired it intentionally. A trial court's findings of fact are binding on appeal when supported by any competent evidence. *State v. Ross*, 329 N.C. 108, 123, 405 S.E.2d 158, 167 (1991).

We first address defendant's argument that under Rules 401 and 402, evidence of Woods' prior violent act was admissible to prove defendant's apprehension and his state of mind when he drew his gun. "Where . . . a defendant seeks under Rule 404(b) to use evidence of a prior violent act by the victim to prove the defendant's state of mind at the time he killed the victim, the defendant must show that he was aware of the prior act and that his awareness somehow was related to the killing." *State v. Strickland*, 346 N.C. 443, 456, 488 S.E.2d 194, 201 (1997), *cert. denied*, 522 U.S. 1078, 139 L. Ed. 2d 757 (1998). However, in the absence of evidence that the defendant shot the victim in self-defense, "evidence of the victim's prior [violent act] . . . [is] not relevant to the killing of the victim." *Id.* (where there was no evidence that defendant shot the victim in self-defense, evidence of the victim's prior assault against his wife was not relevant to the killing of the victim); *see also State v. Leazer*, 337 N.C. 454, 458, 446 S.E.2d 54, 56-57 (1994) (where defendant did not contend he killed in self-defense, evidence that the victim had been convicted of two prior murders would be more prejudicial than pertinent). Indeed, "evidence of a victim's violent character is irrelevant in a homicide case when the defense of accident is raised." *State v. Goodson*, 341 N.C. 619, 623, 461 S.E.2d 740, 742 (1995) (where defendant claimed that shooting his wife was accidental, evidence as to wife's reputation for violence was inadmissible). Because defendant claimed that he never

intentionally shot Woods and that the shooting was accidental, this. evidence was irrelevant and inadmissible under Rule 404(b). It would have served only "to show to the jury that the deceased was somewhat less worthy of living than someone who hadn't performed" violent acts. *State v. Smith*, 337 N.C. 658, 665, 447 S.E.2d 376, 380 (1994). Accordingly, the trial court did not abuse its discretion by excluding this evidence.

We next address defendant's argument that the State opened the door to the excluded evidence by eliciting on cross-examination testimony from defendant that he was "afraid" and "scared" of the victim. A review of the transcript of the present case reveals that the State's cross-examination of defendant did not open the door as defendant claims. The State confirmed defendant's testimony on direct examination that he was scared of Woods, but did not introduce any new related evidence during cross-examination. Only when the State initially elicits the evidence may defendant's otherwise inadmissible evidence be offered to explain or rebut the State. *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981). Because the State did not introduce any new evidence, it did not open the door to the victim's alleged statement concerning the Wade killing.

We next turn to defendant's argument that Rule 106 of the North Carolina Rules of Evidence entitled him to introduce the portion of his statement to the police indicating that the victim had told him she killed Ricky Wade and got away with it. When part of a recorded statement is introduced by a party, Rule 106, known as the "rule of completeness," allows an opposing party to introduce any other part of that statement "at that time . . . which ought in fairness to be considered contemporaneously with it." N.C.G.S. § 8C-1, Rule 106 (1999). Defendant asserts his right to introduce the excluded portion of his statement because other parts of defendant's police statement had been introduced by the State. However, defendant's argument fails because he did not seek to introduce the excluded parts of his police statement contemporaneously as required by the statute, but instead sought to introduce them on rebuttal. *See also State v. Thompson*, 332 N.C. 204, 220, 420 S.E.2d 395, 404 (1992) ("Rule 106 does not require introduction of additional portions of the statement or another statement that are neither explanatory of nor relevant to the passages that have been admitted.").

We have also considered defendant's other arguments made in support of his contention that this evidence should have been ad-

**STATE v. LLOYD**

[354 N.C. 76 (2001)]

mitted and find them meritless. These assignments of error are overruled.

### III.

**[3]** Defendant contends the trial court erroneously admitted into evidence irrelevant, unduly prejudicial, and cumulative photographic and real evidence in violation of Rules 401, 402, and 403 of the North Carolina Rules of Evidence. He argues that four photographs of the victim's front porch showing a pool of blood and the victim's bloodstained shirt, five photographs of the victim's bloodstained shirt marked with bullet holes, and the victim's bloodstained shirt were improperly admitted.

As to defendant's objections to the photographs, we note at the outset that defendant's motion *in limine*, filed to limit the number of photographs admitted into evidence, referred to photographs "of the decedent as the body appeared when first discovered and as the body appeared as the autopsy was conducted by the Medical Examiner's office" but made no reference to photographs of the crime scene or the victim's shirt.

We first address State's exhibit 4, a photograph of the area around the victim's front porch. State's witness Gene Terrill used the photograph to illustrate his testimony as to where he saw the victim lying and the location of her head. He also used the photograph to show both defendant's and the victim's positions on the porch when defendant first shot the victim. Terrill stated that the photograph would help him illustrate and explain this testimony to the jury. Defendant objected that the photograph was inflammatory because it showed blood and argued that the State could "use other photographs to illustrate the location of the decedent at the time he observed her." The trial court overruled defendant's objection and gave the jury the following limiting instruction: "As to State's Exhibit Number 4, I do instruct you that State's Exhibit Number 4 is being introduced into evidence for the limited purpose of illustrating and explaining the testimony of this witness. You're not to consider this photograph for any other reason."

Because defendant objected to the admission of this photograph solely on the basis of Rule 403 of the North Carolina Rules of Evidence, he has waived appellate review on the issue of the relevance of the photograph. N.C. R. App. P. 10(b)(1); *see also State v. Knight*, 340 N.C. 531, 559, 459 S.E.2d 481, 498 (1995). However, even

if defendant had properly preserved the issue of relevance for appeal, the photograph was relevant and admissible under Rules 401 and 402 of the North Carolina Rules of Evidence. We have held that " '[p]hotographs are usually competent to be used by a witness to explain or illustrate anything that it is competent for him to describe in words.' " *State v. Watson,* 310 N.C. 384, 397, 312 S.E.2d 448, 457 (1984) (quoting *State v. Cutshall,* 278 N.C. 334, 347, 180 S.E.2d 745, 753 (1971)). Photographs are admissible to illustrate testimony concerning the manner of a killing in order to prove circumstantially the elements of first-degree murder. *State v. Blakeney,* 352 N.C. 287, 310, 531 S.E.2d 799, 816 (2000), *cert. denied,* 531 U.S. 1117, 148 L. Ed. 2d 780 (2001). Even "gory or gruesome photographs are admissible so long as they are used for illustrative purposes and are not introduced solely to arouse the jurors' passions." *State v. Trull,* 349 N.C. 428, 444, 509 S.E.2d 178, 189 (1998), *cert. denied,* 528 U.S. 835, 145 L. Ed. 2d 80 (1999).

> When determining the admissibility of a photograph, the trial court should consider "[w]hat a photograph depicts, its level of detail and scale, whether it is color or black and white, a slide or a print, where and how it is projected or presented, [and] the scope and clarity of the testimony it accompanies."

*State v. Gaines,* 345 N.C. 647, 666, 483 S.E.2d 396, 407-08 (quoting *State v. Hennis,* 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)), *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997). Here, Terrill testified that the photograph would help him illustrate and explain his testimony to the jury. Therefore, we find such photograph relevant for the purpose of allowing the jury to understand his testimony and for corroborating the State's case.

Defendant contends that even if the photograph was relevant, its prejudicial effect substantially outweighed its probative value, pursuant to Rule 403. Whether to exclude relevant evidence under the Rule 403 balancing test lies "within the sound discretion of the trial court, and the trial court's ruling should not be overturned on appeal unless the ruling was 'manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Hyde,* 352 N.C. 37, 55, 530 S.E.2d 281, 293 (2000) (quoting *State v. Hennis,* 323 N.C. at 285, 372 S.E.2d at 527), *cert. denied,* 531 U.S. 1114, 148 L. Ed. 2d 775 (2001). Because the photograph helped explain Terrill's testimony to the jury, we cannot say that the trial court's decision to admit the photograph

was so arbitrary that it could not have been the result of a reasoned decision.

Defendant also objects to State's exhibits 13, 14, and 15. State's exhibit 13 shows the victim's front porch and her shirt lying next to a pool of blood, State's exhibit 14 shows an enlarged view of the front of the victim's bloodstained shirt with a bullet hole, and State's exhibit 15 shows an enlarged view of the back of the victim's shirt with a bullet hole on the sleeve. State's witness Freddie Woods used exhibit 13 to illustrate his testimony pertaining to observing his mother on the front porch and blood around her body. He used exhibits 14 and 15 to illustrate his testimony about the type of shirt his mother was wearing on the day she was shot and the blood he saw on the shirt. Defendant objected to the photographs, claiming that they were inflammatory because of the quantity of blood depicted and were not illustrative of Freddie's testimony because he testified that emergency personnel prevented him from viewing the victim on the porch. The trial court overruled defendant's objections and instructed the jury as follows:

> [T]he Court is allowing into evidence two photographs, State's Exhibit 13 and State's Exhibit 14. These photographs are being introduced into evidence for the sole and limited purpose of illustrating and explaining the testimony of this witness, Freddie Woods. You're not to consider these photographs for any other purpose. . . .
>
>       . . . .
>
>     . . . State's Exhibit Number 15 is introduced into evidence for the sole and limited purpose of illustrating and explaining the testimony of Freddie Woods. I do instruct you that you're not to consider State's Exhibit 15 for any other purpose.

Here, Freddie testified that the photographs would help illustrate his testimony to the jury concerning the circumstances surrounding Woods' murder. Despite defendant's contention to the contrary, Freddie testified that he was able to view Woods immediately after she was shot and was kept away from the porch area only after emergency personnel arrived. Accordingly, we hold that these photographs were relevant under Rules 401 and 402. We also reject defendant's contention that the photographs were inadmissible because they were inflammatory. We have reviewed the exhibits and do not find them unnecessarily gory. Therefore, we cannot say that the trial court abused its discretion in admitting them.

Later in his testimony, Freddie matched these photographs with the victim's actual bloodstained shirt, which was admitted into evidence without objection. Defendant now argues that it was plain error to admit the victim's shirt because it was irrelevant, unduly prejudicial, and cumulative. However, we have previously held that "[a]rticles of clothing identified as worn by the victim at the time the crime was committed are competent evidence, and their admission has been approved in many decisions of this Court." *State v. Rogers*, 275 N.C. 411, 430, 168 S.E.2d 345, 356 (1969), *cert. denied*, 396 U.S. 1024, 24 L. Ed. 2d 518 (1970). Specifically, we have held that " '[b]loody clothing of a victim that is corroborative of the State's case, is illustrative of the testimony of a witness, or throws any light on the circumstances of the crime is relevant and admissible evidence at trial.' " *State v. Gaines*, 345 N.C. at 666, 483 S.E.2d at 407 (quoting *State v. Knight*, 340 N.C. at 559, 459 S.E.2d at 498) (no abuse of discretion in admitting bloody shirt, pants, belt, radio, radio holder, and handcuff case of victim where items helped jury to understand testimony of witnesses and showed matters that were corroborative of the State's case); *see also State v. Harden*, 344 N.C. 542, 560, 476 S.E.2d 658, 667 (1996) (bloody clothing of officers admissible where it "tended to show the circumstances surrounding the officers' struggle with defendant, the location and number of wounds, and the officers' relative sizes"), *cert. denied*, 520 U.S. 1147, 137 L. Ed. 2d 483 (1997); *State v. Knight*, 340 N.C. at 559, 459 S.E.2d at 498 (victim's bloody jacket, shirt, and T-shirt properly admitted to illustrate testimony of State's witness). We hold that Woods' shirt was relevant to illustrate Freddie's testimony and to illuminate matters that were corroborative of the State's case. Defendant has failed to demonstrate that the trial court committed plain error in admitting this evidence.

The last photographs defendant addresses in his appeal are State's exhibits 57, 68, 69, 70, and 71. These photographs depict the location of shell casings on the porch, bullet holes in the victim's shirt along with a ruler showing the size of the bullet holes, powder burns on the shirt, and the porch where Woods was shot. All five photographs were introduced during the testimony of Officer Lori Oxendine, an identification technician with the Burlington Police Department. Officer Oxendine testified that she could use the photographs to illustrate her testimony to the jury. Defendant objected on the basis that the photographs were cumulative and inflammatory, "showing large amounts of blood." The trial court overruled defend-

ant's objection and instructed the jury: "Ladies and gentlemen, I'm allowing into evidence these photographs, and they're being introduced in evidence for the sole and limited purpose of illustrating and explaining the testimony of this witness, Lori Oxendine. You're not to consider these photographs for any other purpose."

Defendant's argument that the photographs are cumulative must be considered in light of our holding that the number of illustrative photographs admitted lies within the discretion of the trial court. *State v. LaPlanche*, 349 N.C. 279, 283, 507 S.E.2d 34, 36 (1998). Here, we cannot say the trial court abused its discretion in admitting the photographs. The State presented a limited number of photographs to illustrate the scene and the victim's shirt. Each photograph depicted a different aspect of the scene or of the object portrayed. The photographs of the bullet holes and powder burns on the victim's shirt were different from the photographs used to illustrate Freddie's testimony. Freddie identified the shirt as the one worn by Woods on the day of her murder, while Officer Oxendine testified as to the location of bullet holes in the shirt. After reviewing the photographs, we agree with the trial court that they are not inflammatory. The number of photographs admitted was not excessive. They were relevant to illustrate Officer Oxendine's testimony, and their probative value substantially outweighed any danger of unfair prejudice. The victim's shirt showing the location of bullet holes similarly was probative without being unfairly prejudicial. These assignments of error are overruled.

IV.

[4] Defendant next contends the trial court committed error by allowing Officer Dexter Lowe to testify as to what Jovanta Woods told him on 28 September 1998 shortly after the victim's murder. Defendant argues that four of Jovanta's statements to Officer Lowe were not corroborative of his trial testimony and therefore were inadmissible hearsay under Rule 802 of the North Carolina Rules of Evidence.

Jovanta, who was six years old at the time of the trial, testified that he lived with Woods and considered her his mother. On the day she was shot, Woods picked Jovanta up from school, and he worked on homework in the kitchen after they arrived home. While in the kitchen, Jovanta heard the doorbell ring and thereafter heard defendant and the victim "fussing." He recognized defendant's voice because he had heard it four times previously. When he heard two

loud bangs, he went to the front porch where he saw the victim lying down. She did not move or speak to him. Jovanta saw some blood around her, and he also saw defendant drive away quickly in a car. On direct and cross-examination, Jovanta testified that he did not see a gun or any bullets on the porch. He remembered talking to Officer Lowe shortly after the murder and testified that he told Officer Lowe essentially what he had said in court.

Officer Lowe thereafter testified that he was a juvenile investigator with the Burlington Police Department and had interviewed Jovanta on 28 September 1998 shortly after the victim's murder. Over defendant's objection, he summarized Jovanta's statement. In overruling the objection, the trial court instructed the jury: "[I]f you find this corroborates what Jovanta Woods has heretofore testified to, you will consider it. If you find it does not corroborate his testimony, you will disregard it." Defendant asked to be heard outside the presence of the jury and argued that his objection was based on a contradiction between Officer Lowe's statement and Jovanta's trial testimony as to where Jovanta was when the victim was shot. Defendant asked the court to redact that portion of Officer Lowe's statement. The trial court declined defendant's request, brought the jury back, and again instructed that

> the testimony of this officer is being admitted solely for the limited purpose of corroborating the testimony of Jovanta Woods and for no other purpose. And I instruct you that if you find his testimony, that is Officer Lowe's testimony, corroborates what Jovanta Woods has testified, then you will consider that. If you find it does not corroborate what Jovanta Woods has heretofore testified, then you'll disregard it.

Over objection, Officer Lowe related to the jury what Jovanta had told him during the interview:

> I started off explaining to him what my job was, and what it consists of. And at that point, he immediately stated to me that, "I know why I'm here. And the reason is because [defendant] shot my Mama." At that point, I asked the child what had occurred at the residence. And he stated that he had just gotten home from school. He stated that [the victim] had picked him up. That his Uncle Freddie [was] in another room, and he heard some shots. The child stated that [the victim] was in the living room, inside of the house, at the door. That [the defendant] was on the porch arguing with [the victim] over her not doing her job. The child

**STATE v. LLOYD**

[354 N.C. 76 (2001)]

stated he heard three shots he thought, and [the victim] fell down and started bleeding from the nose and the mouth.

The child further stated he never saw a gun, just heard the shots. As he had, was standing beside of [the victim], he further stated that after [the defendant] had shot [the victim], [the defendant] got into a small dark colored vehicle and left. He stated that he knew [the defendant] had shot [the victim] because he saw the bullets on the porch and that they were gold.

Rule 801 of the North Carolina Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1999). Although hearsay is inadmissible except provided by statute or the Rules of Evidence, N.C.G.S. § 8C-1, Rule 802 (1999), an exception to this general rule allows admission of a prior consistent statement. *State v. Lee*, 348 N.C. 474, 484, 501 S.E.2d 334, 341 (1998). Under this exception, "a witness' prior consistent statements may be admitted to corroborate the witness' sworn trial testimony." *State v. Gell*, 351 N.C. 192, 204, 524 S.E.2d 332, 340, *cert. denied*, 531 U.S. 867, 148 L. Ed. 2d 110 (2000). The reasoning supporting admission of prior consistent statements for corroborative purposes " 'rests upon the obvious principle that, as conflicting statements impair, so uniform and consistent statements sustain and strengthen [the witness'] credit before the jury.' " *State v. Levan*, 326 N.C. 155, 167, 388 S.E.2d 429, 435 (1990) (quoting *Jones v. Jones*, 80 N.C. 246, 249 (1879)) (alteration in original).

"Corroborative testimony is testimony which tends to strengthen, confirm, or make more certain the testimony of another witness." *State v. Rogers*, 299 N.C. 597, 601, 264 S.E.2d 89, 92 (1980).

In order to be corroborative and therefore properly admissible, the prior statement of the witness need not merely relate to specific facts brought out in the witness's testimony at trial, so long as the prior statement in fact tends to add weight or credibility to such testimony. . . . However, the witness's prior statements as to facts not referred to in his trial testimony *and not tending to add weight or credibility* to it are not admissible as corroborative evidence. Additionally, the witness's prior contradictory statements may not be admitted under the guise of corroborating his testimony.

*State v. Ramey*, 318 N.C. 457, 469, 349 S.E.2d 566, 573-74 (1986) (citations omitted). In other words, "[w]here testimony which is offered to corroborate the testimony of another witness does so substantially, it is not rendered incompetent by the fact that there is some variation." *State v. Rogers*, 299 N.C. at 601, 264 S.E.2d at 92. " 'Such variations affect only the weight of the evidence which is for the jury to determine.' " *State v. Benson*, 331 N.C. 537, 552, 417 S.E.2d 756, 765 (1992) (quoting *State v. Moore*, 300 N.C. 694, 697, 268 S.E.2d 196, 199 (1980)). Accordingly, "prior consistent statements are admissible even though they contain new or additional information so long as the narration of events is substantially similar to the witness' in-court testimony." *State v. Williamson*, 333 N.C. 128, 136, 423 S.E.2d 766, 770 (1992). A trial court has "wide latitude in deciding when a prior consistent statement can be admitted for corroborative, non-hearsay purposes." *State v. Call*, 349 N.C. 382, 410, 508 S.E.2d 496, 513 (1998).

Defendant argues that the trial court erred by allowing Officer Lowe to testify that: (1) Jovanta said, "I know why I'm here. And the reason is because Willie shot my mama"; (2) Jovanta was standing next to the victim at the time of the shooting; (3) Jovanta heard three shots; and (4) Jovanta saw gold bullets on the porch. We review these statements *seriatim*. The first statement is consistent with and corroborates Jovanta's trial testimony that he heard defendant and the victim arguing, heard shots, saw the victim bleeding and lying on the porch, and saw defendant fleeing the crime scene. *State v. Williamson*, 333 N.C. at 136, 423 S.E.2d at 770 ("prior consistent statements are admissible even though they contain new or additional information so long as the narration of events is substantially similar to the witness' in-court testimony"). In light of the detail given in Jovanta's testimony, his comment that "Willie shot my mama" is an admissible shorthand statement of fact. *State v. Spaulding*, 288 N.C. 397, 411, 219 S.E.2d 178, 187 (1975), *death sentence vacated*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976).

As to the second statement, the officer's testimony was that "[t]he child further stated he never saw a gun, just heard the shots. As he had, was standing beside of [the victim], he further stated that after Willie shot [the victim], Willie got into a small dark colored vehicle and left." We do not agree with defendant's interpretation that Jovanta was with the victim at the moment she was shot. We believe a more reasonable interpretation of the statement is that Jovanta was standing next to the victim when he saw defendant get into a vehicle

and leave. This interpretation is in harmony with Jovanta's statement that he never saw a gun and his trial testimony that he was in the kitchen when he heard shots. The State never suggested that Jovanta was an eyewitness to the crime, and we find no error in admitting this portion of Jovanta's statement to Officer Lowe.

Jovanta's third statement was not definite. He told Officer Lowe he "thought" he heard three shots. This account is not an explicit contradiction to his trial testimony that he heard two shots, and we find that it corroborates his trial testimony that he did hear shots. Moreover, even if it was error to admit this statement, the error was not prejudicial. Defendant never contended that shots were not fired and in fact acknowledged that four shots discharged from his gun as he and the victim struggled over the weapon.

Finally, although Jovanta's fourth statement concerning bullets he saw on the porch does not corroborate his trial testimony, its admission was not prejudicial error. Numerous witnesses, including Chris Smith, Lori Oxendine, Tina Rosencrans, Tye Fowler, and Robert Brown, testified that they observed or recovered these objects on the porch, and even under defendant's version of the shooting there would have been bullets and shell casings at the crime scene. These assignments of error are overruled.

V.

[5] Defendant contends the trial court erroneously admitted testimony of two of the State's witnesses concerning defendant's demeanor at the time of his arrest on 28 September 1998. Defendant argues that such testimony violated Rules 401, 403, 701, and 702 of the North Carolina Rules of Evidence and his rights under the United States and North Carolina Constitutions. As noted above, we shall address those contentions based upon alleged rule violations.

At trial, Eddie Sheffield, a lieutenant with the Alamance County Sheriff's Department, testified that he observed defendant for ten or fifteen minutes when he arrested defendant on 28 September 1998. The State, without objection by defendant, asked Lieutenant Sheffield several questions about defendant's demeanor:

Q. Did you have any conversation with Willie Lloyd when you checked him and before placing him in your car about a firearm?

A. Very little. Mr. Lloyd, I just simply asked him to walk over toward me and he was very, very cordial. He was very humble,

calm. He did exactly what I asked him to do with no hesitation at all.

. . . .

Q. Did he seem to get upset when you cuffed him?

A. No, sir.

. . . .

Q. Did Mr. Lloyd seem to be upset when he was cuffed by Fowler and Fuquay?

A. No, sir.

Q. Did you see him become upset at any time that you were out at that area?

A. No, sir.

Q. How would you describe his demeanor during that period of time, Lieutenant Sheffield?

A. Mr. Lloyd was calm. He was very polite, very cordial, did exactly what I asked him to do with no hesitation whatsoever.

Thereafter, the State began a series of questions pertaining to the witness' experience in homicide investigations, and defendant objected. The trial court overruled the objection, and the following exchange took place:

Q. Based on your experience over fifteen years in investigating or being involved in numerous homicide, homicides and your opportunity to observe the defendant for ten to fifteen minutes on September 28, 1998, was there anything about Willie Lloyd's actions that seemed out of the ordinary or inappropriate to you?

A. Yes.

Q. What did you observe about the defendant's actions that seemed inappropriate to you?

Q. Or out of the ordinary to you?

A. He was overly calm.

Defendant's motion to strike Lieutenant Sheffield's answer was denied.

STATE v. LLOYD

[354 N.C. 76 (2001)]

Burlington Police Detective Tye Fowler also testified that he observed defendant for approximately two to three hours when he arrested him on 28 September 1998. Without objection, the prosecutor asked questions about defendant's demeanor:

Q. And during that period of time, how, how would you describe his demeanor based on your experience as a law enforcement officer and your opportunity to observe him for that period of time on September 28, 1998?

A. He was calm, rational, did not observe any, and I remember looking for any signs of impairment or anything. I found none. His walk, his, was normal. Speech was normal.

Q. Did you observe him display any outward sign of emotion during that period of time you were with him on September 28, 1998?

A. One particular time I thought he may have got a little teary-eyed. I wouldn't describe it as crying, but just a little teary-eyed. Other than that, he was, his emotional level was very level.

However, when the prosecutor began a series of questions based upon Detective Fowler's experience, defendant objected. After the trial court overruled the objection, the following exchange took place:

Q. Based on your experience of going to a number of homicide calls, and based on the defendant knowing, you having told the defendant that he was being charged with murder, was there anything about his actions that seemed out of the ordinary or inappropriate to you?

A. Yes.

Q. What?

Q. What seemed inappropriate or out of the ordinary to you about Mr. Lloyd's actions?

A. His emotional state appeared to be calm.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1999). In the context of a

murder, "evidence is relevant if it 'tend[s] to shed light upon the circumstances surrounding the killing.' " *State v. Richmond*, 347 N.C. 412, 428, 495 S.E.2d 677, 685 (quoting *State v. Stager*, 329 N.C. at 322, 406 S.E.2d at 901), *cert. denied*, 525 U.S. 843, 142 L. Ed. 2d 88 (1998). Here, testimony of defendant's calm demeanor within an hour of shooting the victim tended to negate defendant's claim that the shooting was accidental and to shed light both on the circumstances of the murder and on defendant's intent and state of mind at the time of the offense. Accordingly, such testimony was relevant under Rule 401. *State v. Braxton*, 352 N.C. 158, 186, 531 S.E.2d 428, 444-45 (2000) (testimony by State's witnesses that defendant appeared calm and relaxed immediately after the murder "was relevant . . . to establish his state of mind and intent to kill"), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *State v. Lambert*, 341 N.C. 36, 50-51, 460 S.E.2d 123, 131-32 (1995) (deputies' testimony as to defendant's lack of emotion shortly after her husband's murder was relevant under Rule 401); *State v. Stager*, 329 N.C. at 321-22, 406 S.E.2d at 901 (testimony that defendant was calm and not crying shortly after the victim's death "tend[ed] to shed light upon the circumstances surrounding the killing" and was therefore relevant under Rule 401).

Pursuant to N.C.G.S. § 8C-1, Rule 402, relevant evidence is generally admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403. The decision whether to exclude relevant evidence under Rule 403 lies within the sound discretion of the trial court, *State v. Braxton*, 352 N.C. at 186, 531 S.E.2d at 444, and " 'its ruling may be reversed for abuse of discretion only upon a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision,' " *State v. Richmond*, 347 N.C. at 429, 495 S.E.2d at 686 (quoting *State v. Collins*, 345 N.C. 170, 174, 478 S.E.2d 191, 194 (1996)). Because Lieutenant Sheffield's and Detective Fowler's testimony about defendant's demeanor shortly after the murder was probative of the circumstances surrounding the murder and defendant's intent, we conclude that the trial court did not abuse its discretion in permitting the testimony and ruling that the probative value of the testimony was not substantially outweighed by unfair prejudice. *See State v. Braxton*, 352 N.C. at 186, 531 S.E.2d at 444-45; *State v. Richmond*, 347 N.C. at 428-29, 495 S.E.2d at 685-86; *State v. Lambert*, 341 N.C. at 51, 460 S.E.2d at 132.

We now consider whether the testimony constituted improper lay opinion. Under Rule 701:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701 (1999). We have long held that:

> "The instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time, are, legally speaking, matters of fact, and are admissible in evidence."

*State v. Leak*, 156 N.C. 643, 647, 72 S.E. 567, 568 (1911) (quoting John Jay McKelvey, *Handbook of the Law of Evidence* § 132 (rev. 2d ed. 1907)), *quoted in State v. Stager*, 329 N.C. at 321, 406 S.E.2d at 901. Accordingly, "[o]pinion evidence as to the demeanor of a criminal defendant is admissible into evidence." *State v. Stager*, 329 N.C. at 321, 406 S.E.2d at 900. Here, testimony that defendant was calm shortly after the murder was based upon the investigators' personal observations of defendant for a period of time and was helpful to a clear understanding of whether defendant acted with intent or whether the shooting occurred by accident. *State v. Dickens*, 346 N.C. 26, 46, 484 S.E.2d 553, 564 (1997) (detective's opinion about a witness' demeanor was admissible under Rule 701 where it "was based on his personal observations over the course of two meetings and was helpful to a clear understanding of his testimony concerning the difference between [the witness'] statements"); *State v. Lambert*, 341 N.C. at 51, 460 S.E.2d at 132 (deputies' opinion testimony was admissible where it related to their perceptions of defendant during time shortly after shooting, stemmed from personal experience, and was helpful to clear understanding of defendant's demeanor shortly after crime); *State v. Shoemaker*, 334 N.C. 252, 259-60, 432 S.E.2d 314, 317 (1993) (testimony by law enforcement officers that defendant appeared "carefree," "extremely calm," "nonchalant," "very unconcerned," and "uncaring" on the night of the shooting admissible as opinion evidence). Although defendant argues that testimony comparing his demeanor to that of other homicide suspects was error, we have previously held such comparisons permissible. *See State v. Lambert*, 341 N.C. at 51, 460 S.E.2d at 132. Because the testimony of

Lieutenant Sheffield and Detective Fowler was not offered as expert opinion, we decline to address defendant's contention that the testimony was inadmissible under Rule 702. N.C.G.S. § 8C-1, Rule 702 (2001). These assignments of error are overruled.

VI.

[6] Defendant next contends the trial court erred by allowing pathologist Dr. Butts to testify that each of the victim's four wounds would have been painful. Defendant argues this evidence was irrelevant and unduly prejudicial, pursuant to Rules 401, 402, and 403 of the North Carolina Rules of Evidence. Specifically, he contends: (1) testimony that the victim's wounds would have been painful did not tend to prove that defendant intentionally shot the victim with malice, premeditation, and deliberation, nor did it rebut defendant's claim of accident; and (2) even if the testimony was relevant, it was unduly prejudicial in that it created sympathy for the victim and excited prejudice against defendant. Although defendant also argues that this evidence violated his constitutional rights under the United States and North Carolina Constitutions, we do not address these contentions for the reasons set out above.

At trial, Dr. Butts testified on direct examination that the victim suffered from four gunshot wounds. When asked whether the victim's wounds would have been painful, Dr. Butts responded:

Q. Dr. Butts, can you tell the members of the jury based on your expertice [sic] in your field, medicine and forensic pathology, the type of pain that is associated with Gunshot Wound Number 1 which in your report is to the left breast?

A. My opinion of being shot is painful. It hurts. I can't say anymore than that.

Q. And do you have an opinion as to the pain that would be associated with Gunshot Wound Number 2, the gunshot wound to the right lateral shoulder?

A. It would be painful.

Q. With respect to Gunshot Wound Number 3 to [the] right posterior shoulder, do you have an opinion as to the pain that would be associated with that type of gunshot wound?

A. Yes, sir. It would be painful.

Q. And with respect to Number 4, the gunshot wound to the right abdomen, do you have an opinion?

A. Yes, sir.

Q. And what would that opinion be?

A. It would be painful.

Defendant objected to the State's question as to "gunshot wound number 1" and moved to strike all of Dr. Butts' answers concerning the pain the victim would have suffered. The trial court overruled defendant's objection and denied his motion. Defendant argues that the admission of this evidence was error and additionally claims that the error was exacerbated by the State's closing argument:

And then when you're struggling with somebody, her hand, her finger, his finger, on the trigger of that gun, she's getting shot all these times, and her finger stays right there on the trigger of the gun. Wonder woman. I mean, you know, that's painful, ladies and gentlemen. . . . You know it was painful. Dr. Butts told you it was painful.

We have held that "expert testimony concerning the pain and suffering of the victims in a first-degree murder case is relevant and admissible to assist the jury in ascertaining whether the defendant was acting with premeditation and deliberation." *State v. Vick*, 341 N.C. 569, 582, 461 S.E.2d 655, 662 (1995) (holding Dr. Butts' testimony regarding the victims' pain was relevant and admissible to show premeditation and deliberation); *see also State v. Ali*, 329 N.C. 394, 417, 407 S.E.2d 183, 196-97 (1991) (testimony from medical examiner that victim's wounds would have been painful was relevant and admissible in determining whether killing was done with premeditation and deliberation). Accordingly, Dr. Butts' testimony was relevant to assist the jury in determining whether defendant acted with premeditation and deliberation and to rebut defendant's claim of accident. Moreover, the State properly used the testimony as a basis for its argument that if the victim had her hand on the gun as defendant contended, it was unlikely that she would have kept it there during four separate shots that caused her pain.

We also disagree with defendant's contention that the testimony was unfairly prejudicial. In *State v. Gaines*, 345 N.C. at 664, 483 S.E.2d at 406, the surgeon who treated the victim testified that the pain from the victim's wounds "must have been excessive." Although

the defendant contended that the testimony was unfairly prejudicial, we held as follows:

> The State's evidence at trial showed that the victim was shot one time in the chest with a shotgun. Dr. Robicsek testified, without objection, that the victim had an extensive wound on the upper abdomen and was bleeding profusely from that wound, that there were major injuries in the lower portion of the right lung, and that there were extensive injuries in the upper abdomen. In light of this testimony, Dr. Robicsek's statement, that the victim's pain was "excessive," cannot be said to be unfairly prejudicial.

*Id.* at 665, 483 S.E.2d at 406-07. In the case at bar, Dr. Butts testified that the wound to the victim's lower right abdomen damaged her large bowel and part of her hip bone. He also described one of the wounds to the victim's right shoulder area as causing damage to her lungs, heart, spleen, and stomach, resulting in "a great deal of internal bleeding or hemorrhaging." When asked what the victim's capability would have been after receiving the wound, Dr. Butts responded that "the movement of that particular part of the body would likely have been painful." Defendant did not object to any of this testimony, nor did he object to the admission into evidence of eight of the nine photographs taken of the victim by Dr. Butts during the autopsy. In light of this testimony, we do not find Dr. Butts' statements concerning the victim's pain unfairly prejudicial. These assignments of error are overruled.

## VII.

**[7]** Defendant argues that he is entitled to a new trial because the trial court erroneously allowed the State to make grossly improper comments during closing arguments in the guilt-innocence phase of the trial. Defendant first asserts that the State improperly traveled outside the record when it argued:

> You know, you want to hold the Burlington Police Department to that kind of standard? They've got to do every single one of those things Mr. Garner ticked off in every single crime, you better hope you're not a victim in a criminal case, because they won't have time to investigate it. . . . They do the best they can to fight crime in county, in the City of Burlington.

The trial court overruled defendant's objection to these comments, then later instructed the jury:

**STATE v. LLOYD**

[354 N.C. 76 (2001)]

Ladies and gentlemen, these closing arguments are not to be construed by you as evidence in the case and is [sic] not to be construed as your instructions on the law. I will give you the instructions on the law. Nevertheless, all three of the attorneys have an opportunity . . . to argue to you their contentions and positions in this case.

Defendant renewed his objection at the close of the State's argument and moved for a mistrial, without success.

A trial judge "must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case." N.C.G.S. § 15A-1061 (1999). "The decision to grant or deny such a motion will not be disturbed on appeal unless it is so clearly erroneous as to amount to a manifest abuse of discretion." *State v. Diehl*, 353 N.C. 433, 436, 545 S.E.2d 185, 187 (2001).

As to closing arguments, we have stated the following:

" 'Trial counsel is allowed wide latitude in argument to the jury and may argue all of the evidence which has been presented as well as reasonable inferences which arise therefrom.' " *State v. Hyde*, 352 N.C. 37, 56, 530 S.E.2d 281, 294 (2000) (quoting *State v. Guevara*, 349 N.C. 243, 257, 506 S.E.2d 711, 721 (1998), *cert. denied*, 526 U.S. 1133, 143 L. Ed. 2d 1013 (1999)), *cert. denied*, [531] U.S. [1114], [148] L. Ed. 2d [775] (2001). This Court will not disturb the trial court's exercise of discretion over the latitude of counsel's argument absent any gross impropriety in the argument that would likely influence the jury's verdict. "We further emphasize that 'statements contained in closing arguments to the jury are not to be placed in isolation or taken out of context on appeal. Instead, on appeal we must give consideration to the context in which the remarks were made and the overall factual circumstances to which they referred.' " [*State v.*] *Guevara*, 349 N.C. at 257, 506 S.E.2d at 721 (quoting *State v. Green*, 336 N.C. 142, 188, 443 S.E.2d 14, 41, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994)).

*State v. Cummings*, 353 N.C. 281, 297, 543 S.E.2d 849, 859 (2001).

Defendant specifically points to the State's comment, "you better hope you're not a victim in a criminal case," and contends that this statement improperly urged jurors to put themselves in the place of

the victim. Although "[a]n argument 'asking the jurors to put themselves in place of the victims will not be condoned,'" *State v. McCollum*, 334 N.C. 208, 224, 433 S.E.2d 144, 152 (1993) (quoting *United States v. Pichnarcik*, 427 F.2d 1290, 1292 (9th Cir. 1970)), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994), the State here merely told jurors that they should hope that they do not become victims of crime. Defendant had appropriately pointed out in his closing argument various avenues of investigation that the State had not pursued, and the State responded to the effect that if the police followed defendant's suggestions, criminal investigations would be burdensome and protracted. At no point did the State urge the jurors to put themselves in the place of Catherine Woods.

Defendant also points to the State's remark that the police "do the best they can to fight crime" and asserts that this comment was outside of the evidentiary record. We have held that prosecutors may "defend their own tactics, as well as those of the investigating authorities, when challenged." *State v. Payne*, 312 N.C. 647, 665, 325 S.E.2d 205, 217 (1985). As noted above, defendant argued that the Burlington Police Department did not properly or thoroughly investigate the shooting of Catherine Woods. The prosecutor here was defending the tactics of the Burlington Police Department against that challenge. Accordingly, the trial court did not abuse its discretion in denying defendant's motion for a mistrial.

Defendant contends that the prosecutor improperly argued personal beliefs and opinions not supported by the evidence and personally vouched for the evidence when he stated:

> You know, you've been told that the investigation stank. You've been told that our witnesses have lied basically. You've been told that you ought to believe Willie Lloyd because he testified under oath. I think everyone of them was sworn in and took this stand, and they had to put their hand on that Bible to tell you they were telling the truth. And that I don't have first degree murder when a woman has been shot at six times on her front porch, hit four times and it's an accident, this is the biggest, most preposterous accident that has ever happened in Alamance County if that's what you find.
>
> . . . .
>
> Who's got something to gain by what they told you from this chair, ladies and gentlemen? Who's going to get punished if you

find him guilty? It ain't Catherine Woods. If I didn't have a case of first degree murder, if the evidence wasn't sufficient for you to consider any of [the] things the Judge was going to tell you, you wouldn't be here to consider that. You wouldn't find out the law on that.

The trial court overruled defendant's objections to this argument and advised the jury that "[t]he attorneys for the State and the defendant, ladies and gentlemen, have an opportunity to argue their contentions and positions, and you should give them your close attention."

Defendant specifically points to the State's characterization of defendant's version of the shooting as "the biggest, most preposterous accident that has ever happened in Alamance County" and argues that this opinion was improper. However, this language was the prosecutor's response to defendant's contention that the shooting was accidental. We have held that "hyperbolic language is acceptable in jury argument so long as it is not inflammatory or grossly improper." *State v. Hill*, 347 N.C. 275, 298, 493 S.E.2d 264, 277 (1997) (trial court did not err by failing to grant a mistrial *ex mero motu* where prosecutor argued that "this may be the most atrocious crime that has occurred here in Harnett County"), *cert. denied*, 523 U.S. 1142, 140 L. Ed. 2d 1099 (1998); *see also State v. Larry*, 345 N.C. 497, 530, 481 S.E.2d 907, 926 (no error where prosecutor argued to jury that defendant was the "worst of the worst"), *cert. denied*, 522 U.S. 917, 139 L. Ed. 2d 234 (1997); *State v. Fullwood*, 343 N.C. 725, 740-41, 472 S.E.2d 883, 891 (1996) (no error where prosecutor argued that defendant's crime was "one of the worst murders anybody has ever heard of"), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339 (1997). We conclude that the prosecutor did not state his personal opinion in arguing that, if defendant was right, the shooting was "the biggest, most preposterous accident that has ever happened in Alamance County." As in the cases cited above, the State's argument was that the jury should conclude from the evidence that the shooting was intentional.

Defendant also argues that the prosecutor's statements, "[i]f I didn't have a case" and "if the evidence wasn't sufficient," constituted improper vouching for the evidence. After a review of the entire argument, we conclude that the prosecutor was doing no more than speaking with proprietary interest when he referred to "his" case. The gist of his comments was a request that the jurors carefully attend the judge's forthcoming instructions to determine whether his arguments

were consistent with the law. Accordingly, the comments were not objectionable.

Finally, defendant contends the prosecutor made improper biblical arguments when he recited the following "Dance, Death" poem during closing arguments:

> [Defendant] is as guilty of first degree murder as sure as he's sitting in that chair in this courtroom right now, ladies and gentlemen of the jury.

> Dance of death. Your deeds are done. A new time has set in, and you are summoned by the maker. One day death itself will dance before the Lord. The wind and breath of the Lord will call for death. Slowly death will bring all limp life and all brutal forms of death to the judgment seat. God will pronounce death guilty, will sentence death to death, and thus sentence to death tears, crying, hunger and lonesomeness and disease.

> Even now, there's enough evidence gathered against death by those who live under the spirit. They build evidence while they work, and while they wait for the dance of death. . . . The date has been set. God knows the hour.

Defendant did not object to these statements but now argues that the trial court should have intervened *ex mero motu*.

When "a defendant fails to object during closing argument, the standard of review is whether the argument was so grossly improper that the trial court erred in failing to intervene *ex mero motu*." *State v. Call*, 353 N.C. 400, 416-17, 545 S.E.2d 190, 201 (2001). " '[O]nly an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken.' " *State v. Davis*, 353 N.C. 1, 31, 539 S.E.2d 243, 263 (2000) (quoting *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693, *cert. denied*, 519 U.S. 890, 136 L. Ed. 2d 160 (1996)). Indeed, " '[t]o establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair.' " *State v. Grooms*, 353 N.C. 50, 81, 540 S.E.2d 713, 732 (2000) (quoting *State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999)).

STATE v. LLOYD

[354 N.C. 76 (2001)]

We previously have discouraged arguments that improperly use religious sentiment. *State v. Ingle*, 336 N.C. 617, 648, 445 S.E.2d 880, 896 (1994), *cert. denied*, 514 U.S. 1020, 131 L. Ed. 2d 222 (1995). Specifically:

> This Court has disapproved " 'arguments to the effect that the law enforcement powers of the State come from God and that to resist those powers is to resist God.' " *State v. Cummings*, 352 N.C. 600, 628, 536 S.E.2d 36, 56 (2000) (quoting *State v. Geddie*, 345 N.C. 73, 100, 478 S.E.2d 146, 160 (1996), *cert. denied*, 522 U.S. 825, 139 L. Ed. 2d 43 (1997))[, *cert. denied*, —— U.S. ——, 149 L. Ed. 2d 641 (2001)]. We have also repeatedly cautioned counsel " 'that they should base their jury arguments solely upon the secular law and the facts.' " [*State v.*] *Davis*, 353 N.C. at 28, 539 S.E.2d at 262 (quoting *State v. Williams*, 350 N.C. 1, 27, 510 S.E.2d 626, 643, *cert. denied*, 528 U.S. 880, 145 L. Ed. 2d 162 (1999)).

*State v. Call*, 353 N.C. at 419, 545 S.E.2d at 202-03.

> "Jury arguments based on any of the religions of the world inevitably pose a danger of distracting the jury from its sole and exclusive duty of applying secular law and unnecessarily risk reversal of otherwise error-free trials. Although we may believe that parts of our law are divinely inspired, it is the secular law of North Carolina which is to be applied in our courtrooms. Our trial courts must vigilantly ensure that counsel for the State and for defendant do not distract the jury from [its] sole and exclusive duty to apply secular law."

*State v. Braxton*, 352 N.C. at 217, 531 S.E.2d at 462 (quoting *State v. Williams*, 350 N.C. at 27, 510 S.E.2d at 643) (alteration in original).

However, despite these admonitions, we have "found biblical arguments to fall within permissible margins more often than not." *State v. Artis*, 325 N.C. 278, 331, 384 S.E.2d 470, 500 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Most pertinently, we have twice held that prosecutorial arguments citing the identical "Dance, Death" language used here were not so grossly improper as to require the trial court to intervene *ex mero motu*. *State v. Moody*, 345 N.C. 563, 574-75, 481 S.E.2d 629, 634-35, *cert. denied*, 522 U.S. 871, 139 L. Ed. 2d 125 (1997); *State v. Elliott*, 344 N.C. 242, 284-85, 475 S.E.2d 202, 222 (1996), *cert. denied*, 520 U.S. 1106, 137 L. Ed. 2d 312 (1997). Although we disapprove of and caution

prosecutors against using such language in arguments to the jury, because the remarks did not suggest that the law enforcement powers of the State were divinely ordained or inspired by God, nor did they suggest that to resist such powers is to resist God, we cannot say that the arguments were so grossly improper that the trial court erred in failing to intervene *ex mero motu*. *State v. Cummings*, 352 N.C. at 628-29, 536 S.E.2d at 56 ("[w]hen the potential impact of a biblical reference is slight, it does not amount to gross impropriety requiring the trial court's intervention"). These assignments of error are overruled.

## VIII.

[8] Finally, defendant contends the trial court erroneously instructed the jury that it could consider evidence of flight in determining his guilt, claiming that the evidence did not support the instruction. As noted above, we will not address defendant's arguments that the instruction violated his rights under the United States and North Carolina Constitutions.

During the charge conference, the trial court informed the parties that it intended to give an instruction on flight in accordance with the pattern instruction, N.C.P.I.—Crim. 104.36. Defendant objected, stating that "[f]light, if there was any[,] was soon cured by the defendant voluntarily turning himself in," and argued that flight goes beyond fleeing the scene of a crime and means to "flee the jurisdiction of a court." The court overruled defendant's objection and instructed the jury as follows:

> Now, ladies and gentlemen, the State contends that the defendant Willie Junior Lloyd fled. Evidence of flight may be considered by you together with all other facts and circumstances in this case in determining whether the combined circumstances amount to an admission or show of consciousness of guilt. However, proof of this circumstance is not sufficient in[] itself to establish the defendant's guilt[].
>
> Further, this circumstance[] has no bearing on the question of whether the defendant acted with premeditation and deliberation. Therefore, it must not be considered by you as evidence of premeditation or deliberation.

At the close of the court's charge to the jury, defendant renewed his objection to the instruction.

STATE v. LLOYD

[354 N.C. 76 (2001)]

We have held that "[e]vidence of a defendant's flight following the commission of a crime may properly be considered by a jury as evidence of guilt or consciousness of guilt." *State v. King*, 343 N.C. 29, 38, 468 S.E.2d 232, 238 (1996). A trial court may properly instruct on flight where there is " 'some evidence in the record reasonably supporting the theory that the defendant fled after the commission of the crime charged.' " *State v. Allen*, 346 N.C. 731, 741, 488 S.E.2d 188, 193 (1997) (quoting *State v. Fisher*, 336 N.C. 684, 706, 445 S.E.2d 866, 878 (1994), *cert. denied*, 513 U.S. 1098, 130 L. Ed. 2d 665 (1995)). However, "[m]ere evidence that defendant left the scene of the crime is not enough to support an instruction on flight. There must also be some evidence that defendant took steps to avoid apprehension." *State v. Thompson*, 328 N.C. 477, 490, 402 S.E.2d 386, 392 (1991).

In the case at bar, there was testimony from numerous witnesses that defendant hurriedly left the scene of the murder without providing medical assistance to the victim. Jovanta Woods testified that he saw defendant drive away quickly from his residence. Freddie Woods also testified that he saw defendant run toward his vehicle and drive away "extremely fast." Gene Terrill testified that he saw defendant go to his car at a hurried pace after shooting the victim and drive off at a "very fast rate." Tim Guffey testified that he saw defendant "running down the steps towards his car. And then he slammed the door. And he took off real fast, you know. He was fish tailing down the street." Guffey added that defendant did not stop at the stop sign and "[l]ooked like he was going to wipe the side of the street out on both sides, you know, the way he was going." Katie Poole stated that she heard defendant's car "spinning off, like tires were hollering." Mike Long testified that after hearing shots, he "heard somebody take-off squeeling [sic] tires a little bit." Jason McPherson was driving near the victim's home after the murder when he saw defendant "going around two lanes of traffic on the wrong side of the street, and through an intersection, which about hit me in the process."

After defendant ran to his car and recklessly sped away from the scene of the crime, he drove to Culp Weaving to confront Coltraine. Defendant then went to a convenience store where he bought a soda. Although he thereafter called the Burlington Police Department to arrange a surrender, at no time during his conversation with Officer Peter Wan did defendant request assistance for the victim, nor did he tell the officer where he could then be found. Instead, he said he needed to drive around for half an hour to clear his head before turning himself in. Defendant then went to another convenience store to

buy cigarettes and another soft drink. At some point prior to turning himself in, defendant also called his mother and told her that the victim had been hurt.

Defendant argues that "[w]hile the record evidence showed that defendant drove away from the Plaid Street house shortly after the shooting, it also clearly showed that he did so because he was shaken and needed to get himself together." However, we have held that " '[t]he fact that there may be other reasonable explanations for defendant's conduct does not render the instruction improper.' " *State v. Norwood*, 344 N.C. 511, 534, 476 S.E.2d 349, 359-60 (1996) (quoting *State v. Irick*, 291 N.C. 480, 494, 231 S.E.2d 833, 842 (1977)) (holding that "defendant's contention that his response to the fire was the natural response of a retarded person from an unexpected result does not negate the evidence of flight"), *cert. denied*, 520 U.S. 1158, 137 L. Ed. 2d 500 (1997). The evidence of defendant's behavior in the aftermath of the shooting establishes that he did more than merely leave the scene of the crime and is sufficient to support a finding of consciousness of guilt, as set out in the instruction. Therefore, the trial court properly instructed the jury as to defendant's flight. *State v. Beck*, 346 N.C. 750, 758, 487 S.E.2d 751, 757 (1997) (evidence sufficient to support instruction on flight where defendant shot victim, left residence without rendering any assistance or seeking to obtain medical assistance for victim, and told cab driver to leave area where he resided after seeing police vehicles there); *State v. Fisher*, 336 N.C. at 706, 445 S.E.2d at 878 (evidence sufficient to warrant instruction on flight where defendant ran from scene and some hours later telephoned Winston-Salem Police Department to turn himself in); *State v. Sweatt*, 333 N.C. 407, 419, 427 S.E.2d 112, 119 (1993) (no error in instruction on flight where evidence showed that "shortly after the victim was murdered, defendant passed [police officer] on the highway traveling at a very high rate of speed").

Accordingly, we reject defendant's contention that he was prejudiced by the instruction. "[T]he trial court's instruction correctly informed the jury that proof of flight was not sufficient by itself to establish guilt and would not be considered as tending to show premeditation and deliberation." *State v. Grooms*, 353 N.C. at 81, 540 S.E.2d at 732. The court did not suggest that there was evidence to support the State's contention of flight, but instructed only that the State contended that defendant fled. "Where there is some evidence supporting the theory of the defendant's flight, the jury must decide whether the facts and circumstances support the State's contention

that the defendant fled." *State v. Norwood*, 344 N.C. at 535, 476 S.E.2d at 360. Consequently, it was not error for the prosecutor to argue flight to the jury. These assignments of error are overruled.

Based upon the foregoing, we find no prejudicial error in the guilt-innocence phase of defendant's trial.

## CAPITAL SENTENCING PROCEEDING

[9] We address in detail only defendant's contention that the trial court erroneously submitted to the sentencing jury the statutory aggravating circumstance that the murder was "especially heinous, atrocious, or cruel" (HAC). N.C.G.S. § 15A-2000(e)(9) (1999). The jury found this and other aggravating circumstances and recommended a death sentence. We conclude from a careful review of the record that submission of this aggravating circumstance was error, and we vacate the sentence of death on this ground.

The State correctly contends that

[i]n determining whether the evidence is sufficient to support a finding of essential facts which would support a determination that a murder was "especially heinous, atrocious, or cruel" the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom.

*State v. Hamlet*, 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984). However, we have also held that "[w]here it is doubtful whether a particular aggravating circumstance should be submitted, the doubt should be resolved in favor of defendant." *State v. Oliver*, 302 N.C. 28, 61, 274 S.E.2d 183, 204 (1981). Accordingly, in deciding whether to give the instruction, the court must view any evidence tending to show that a murder was especially heinous, atrocious, or cruel in the light most favorable to the State. If doubt nevertheless remains, the instruction should not be given.

We have held that the HAC aggravating circumstance is appropriately given "when the level of brutality involved exceeds that normally found in first-degree murders or when the murder in question is conscienceless, pitiless, or unnecessarily torturous to the victim," *State v. Kandies*, 342 N.C. 419, 450, 467 S.E.2d 67, 84, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996), or where the killing was committed in a fashion beyond what was necessary to effectuate the victim's death, *State v. Reese*, 319 N.C. 110, 146, 353 S.E.2d 352, 373

(1987), *overruled on other grounds by State v. Barnes*, 345 N.C. 184, 481 S.E.2d 44, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *and cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). However, it has been our intention that the HAC aggravating circumstance not become "a 'catch all' provision which can always be employed in cases where there is no evidence of other aggravating circumstances." *State v. Goodman*, 298 N.C. 1, 25, 257 S.E.2d 569, 585 (1979). We have identified three types of murders that would warrant the submission of the HAC aggravating circumstance. *State v. Golphin*, 352 N.C. 364, 480, 533 S.E.2d 168, 242 (2000), *cert. denied*, —— U.S. ——, 149 L. Ed. 2d 305 (2001). The first type consists of those killings that are physically agonizing for the victim or which are in some other way dehumanizing. *State v. Lloyd*, 321 N.C. 301, 319, 364 S.E.2d 316, 328, *sentence vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988). The second type includes killings that are less violent but involve infliction of psychological torture by leaving the victim in his or her "last moments aware of but helpless to prevent impending death," *State v. Hamlet*, 312 N.C. at 175, 321 S.E.2d at 846, and thus may be considered "conscienceless, pitiless, or unnecessarily torturous to the victim," *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826-27 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *and overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). The third type includes killings that "demonstrate[] an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder[s]." *Id.* at 65, 337 S.E.2d at 827.

We begin with a review of analogous cases. The State refers us to *State v. Sexton*, 336 N.C. 321, 444 S.E.2d 879, *cert. denied*, 513 U.S. 1006, 130 L. Ed. 2d 429 (1994), and *State v. Alston*, 341 N.C. 198, 461 S.E.2d 687 (1995), *cert. denied*, 516 U.S. 1148, 134 L. Ed. 2d 100 (1996), in which we upheld the submission of the HAC aggravating circumstance. In *Sexton*, the defendant abducted, raped, and strangled the victim, while in *Alston*, the defendant burglarized the victim's home, savagely beat her, strangled her, and left her body for her mother to find. While *Sexton* and *Alston* are similar to the case at bar in several respects, they are different in that the victims in those cases were strangled, not shot. Although we are unwilling to suggest that the method by which a murderer kills his victim is anything more than one consideration among many in determining whether submission of an aggravating or mitigating circumstance is appropriate, our holdings imply that a killing by strangulation is more likely to be "especially heinous, atrocious, or cruel" than an

otherwise similar murder by shooting. For instance, in *Sexton* we wrote that

> in her last moments, the victim, the mother of a young child, lay nude with soaking wet hair on the backseat of her van, as a stranger whom she could look in the eye wrapped her stockings around her neck. Whatever the time span, the minimum or longer, that it took for the victim to lose consciousness, the moments just before and during the strangulation would have been filled with overwhelming panic for the victim who, knowing that death was impending, was helpless to prevent it. To the victim, this ten seconds or longer was not a brief moment. A jury could reasonably infer that as the breath of life was choked out of the victim, she experienced extreme anguish and psychological terror.

*State v. Sexton,* 336 N.C. at 374, 444 S.E.2d at 909. We went on to find that the facts in *Sexton* were similar to two other strangulation cases where the HAC aggravating circumstance had properly been submitted, but were unlike two shooting cases where the evidence was held insufficient to support submission of the HAC circumstance. *Id.* at 374-75, 444 S.E.2d at 909.

The State also argues that our analysis of the stabbing death in *State v. Lloyd,* 321 N.C. 301, 364 S.E.2d 316, supports the submission of the HAC aggravating circumstance in the case at bar. However, the victim in *Lloyd* suffered a somewhat prolonged death lasting at least five to ten minutes during which time he knew of his impending death but was left helpless to prevent it. It was on this basis that the trial court's submission of the HAC factor was affirmed, although there was also evidence that the death was physically agonizing to the victim. *Id.* at 320, 364 S.E.2d at 328. As detailed below, the victim in the case at bar suffered a less protracted death.

The State additionally cites two murder cases involving fatal gunshot wounds in which we upheld the submission of the HAC aggravating circumstance to the jury. *State v. Lynch,* 340 N.C. 435, 459 S.E.2d 679 (1995), *cert. denied,* 517 U.S. 1143, 134 L. Ed. 2d 558 (1996); *State v. Brown,* 315 N.C. 40, 337 S.E.2d 808. However, each of these cases is distinguishable from the case at bar. In *Lynch,* the defendant was found guilty of shooting two victims fatally, and the HAC aggravating circumstance was submitted as to one of them. This victim was first shot as she sat in an automobile. Although she was able to exit the car, the defendant shot her several more times as she staggered in the street, then shot her again as a rescuer attempted to

drag her to safety. *State v. Lynch*, 340 N.C. at 448, 459 S.E.2d at 699. In *Brown*, the victim, although shot six times, lived as long as fifteen minutes. *State v. Brown*, 315 N.C. at 66, 337 S.E.2d at 827. By contrast, although the record in the case at bar does not reveal the precise number of minutes the victim survived after being shot, the evidence nevertheless demonstrates that death was relatively rapid. Robert Brown, a responding emergency medical technician, testified that Woods quit breathing and her pulse stopped prior to intubation, and he believed she was dead when she was taken from the porch. Dr. Butts testified that one suffering from the victim's wounds

> would not be in my opinion necessarily rendered immediately unconscious, but bleeding would be relatively rapid and extensive, and [it] would be my opinion that they would be likely to lose consciousness within a relatively short period of time. Within a matter of [a] few minutes, be my opinion, if not sooner.

Dr. Butts' opinion is consistent with Freddie's testimony that the victim was bleeding extensively and was incapacitated after providing defendant's name and with Jovanta's testimony that the victim did not speak to him when he came out to the porch.

Although the State points out that the victim suffered as a result of four individual gunshot wounds, we have never held that being shot more than one time by itself necessarily makes death especially physically agonizing to an extent sufficient to support the submission of the HAC aggravating circumstance. *See, e.g., State v. Stanley*, 310 N.C. 332, 340, 312 S.E.2d 393, 398 (1984) (evidence insufficient to support submission of the HAC circumstance where victim became unconscious minutes after being shot nine times in rapid succession); *State v. Hamlette*, 302 N.C. 490, 504, 276 S.E.2d 338, 347 (1981) (evidence insufficient to support submission of the HAC circumstance even though victim lingered twelve days after being shot multiple times). As noted above, the evidence indicates that the victim did not remain conscious long after the wounds were inflicted.

The State argues that the victim's death was dehumanizing because she died in front of strangers and family members. However, no family members witnessed the actual shooting, and the victim's time of consciousness afterwards was relatively short. Although we agree that a trial court may properly consider this aspect of a case in determining whether to instruct on the HAC aggravating circumstance, we note that in *State v. Stanley*, 310 N.C. at 333-34, 312 S.E.2d

at 394-95, involving a similar shooting, the State did not argue and we did not consider the presence of others in determining whether the murder was especially heinous, atrocious, or cruel. Some aspects of the HAC circumstance address the mental condition of the victim, while other aspects address the defendant's state of mind. Accordingly, in considering whether the victim's death was dehumanizing, we consider both that no one else was present when defendant shot the victim and that the victim's son and grandson saw her immediately after she was felled and watched her perish. The former circumstance, focusing on defendant, suggests that he did not seek to make the victim's death especially horrifying or to inflict emotional torment on her, while the latter circumstance, focusing on the victim, suggests that she was aware that beloved family members were powerless to save her in her final moments.

Such nuances in interpretation of the evidence, some of which weigh in favor of giving the HAC aggravating circumstance while others weigh against it, require that the trial court balance all aspects of the case in determining whether to give the instruction. On review, we conduct a similar balancing test and conclude that the victim's tragic death was not especially physically agonizing or otherwise dehumanizing to the victim in a way that justified imposition of the HAC aggravating circumstance.

The State argues that submission of the HAC circumstance was appropriate because the victim did not lose consciousness immediately after being shot and consequently was aware of the inevitability of death. However, we have never held that the fact that death was somewhat lingering necessarily makes a murder especially heinous, atrocious, or cruel. *State v. Artis*, 325 N.C. at 320, 384 S.E.2d at 494. The threshold requirement that the State must meet before the HAC aggravating circumstance can be submitted for any type of murder is whether the level of brutality involved exceeds that normally present in first-degree murder. *State v. Goodman*, 298 N.C. at 25, 257 S.E.2d at 585. As a practical matter, our review of cases involving fatal shootings indicates that frequently death is not instantaneous and the victim remains conscious for at least a few minutes before expiring. Accordingly, the fact that a victim's death is not immediate does not by itself establish that a killing was especially heinous, atrocious, or cruel. *See, e.g., State v. Hamlet*, 312 N.C. at 176-77, 321 S.E.2d at 846-47 (submission of HAC circumstance improper where first shot hit victim in head and rendered him unconscious until he died five hours later); *State v. Stanley*, 310 N.C. at 340, 312 S.E.2d at 398 (sub-

mission of HAC circumstance improper even though victim shot nine times but did not die instantly); *State v. Hamlette*, 302 N.C. at 504, 276 S.E.2d at 347 (submission of HAC circumstance improper even though victim lingered twelve days before dying). As detailed above, the evidence in the case at bar strongly suggests that the victim became unconscious shortly after being shot. "That [the victim] might have remained conscious for a matter of minutes after being shot does not distinguish this case from the ordinary death-by-shooting cases." *State v. Stanley*, 310 N.C. at 340, 312 S.E.2d at 398.

In addition, although we have held that the HAC aggravating circumstance may apply where the defendant inflicts psychological torture before the murder by stalking the victim, *see State v. Moose*, 310 N.C. 482, 494, 313 S.E.2d 507, 515 (1984), in the case at bar, there was no evidence that the victim was aware that she was going to be killed until defendant shot her. The State properly concedes in its brief that the victim was not being "stalked for the kill." Consequently, the victim did not suffer psychological torture from a realization that defendant was preparing to kill her.

Two other cases cited by the State, *State v. Bonney*, 329 N.C. 61, 405 S.E.2d 145 (1991) (defendant reloaded weapon twice while shooting victim, who was at least initially alive and unable to escape, twenty-seven times), and *State v. Pinch*, 306 N.C. 1, 292 S.E.2d 203, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *overruled on other grounds by State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543 (1994), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995), *by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995), *and by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (defendant allowed each victim to hear the other being shot while helpless to prevent his own death), are factually distinguishable. In the case at bar, the victim was shot four times without warning and in rapid succession. By contrast, in *Bonney* and *Pinch*, significant time elapsed between the initial gunshot wound and the subsequent fatal shots. Although the victim's death in the case at bar was not instantaneous, it cannot be said to have been "especially" torturous for the victim.

The State contends that the evidence shows that defendant not only lacked remorse, but also bragged about killing his victim. Our review of the record indeed suggests that defendant was calm in the aftermath of the shooting and did not express regret, although we note that Detective Fowler testified that defendant appeared to be "a

little teary-eyed" at one point. The record does not indicate whether defendant's sorrow was for the victim or for himself. Nevertheless, we do not interpret defendant's confrontation with Coltraine in the aftermath of the shooting as mere braggadocio. Although defendant unquestionably wanted Coltraine to know he was not a man to be taken lightly, he also told Coltraine to go to the victim's home. Defendant thereafter demonstrated some understanding of the gravity of his act by voluntarily surrendering to the police. Taken together, these facts fail to demonstrate that defendant exhibited unusual depravity of mind. Thus, the case at bar is distinguishable from *State v. Oliver*, 309 N.C. 326, 307 S.E.2d 304 (1983), cited by the State, in which the defendant boasted to fellow inmates that he had "kind of liked the idea of" killing the victim. *Id.* at 347, 307 S.E.2d at 319.

The State also argues that defendant acted with unusual depravity of mind because he did not attempt to help his victim after shooting her and fled the scene without knowing whether anyone would call for medical assistance. However, there was evidence at trial that defendant turned and saw Freddie standing in the door after the shooting, suggesting that defendant knew someone was home to help the victim. In addition, he drove to Coltraine's place of work to inform him about the shooting.

Although defendant shot the victim four times, the record does not indicate the sequence in which the wounds were inflicted. According to Dr. Butts' testimony, not all the shots caused fatal injuries, but the immediately fatal shot apparently was fired from above and behind the victim, leading to an inference that it was not the first. In addition, all four shots were fired in quick succession. Accordingly, we fail to see that this evidence suggests that defendant carried out this shooting in a fashion beyond that necessary to effectuate the victim's death.

Finally, we are aware that the trial court must consider all relevant factors in the case before it as it determines whether to instruct a jury as to this aggravating circumstance, giving these factors appropriate weight and balancing them against each other. Nevertheless, after reviewing all aspects of this case, and being mindful of the (e)(9) requirement that the killing be *especially* heinous, atrocious, or cruel, we conclude that the trial court erred in instructing the jury as to that aggravating circumstance. Accordingly, we vacate the death sentence and remand for a new capital sentencing proceeding.

Most of the remaining issues raised by defendant in this appeal are unlikely to arise again at resentencing. However, in the interest of judicial economy, we address three additional matters that may recur upon remand.

At his sentencing proceeding, defendant requested that the trial court peremptorily instruct the jury pursuant to the mitigating circumstance set out in subsection 15A-2000(f)(8) that "[t]he defendant aided in the apprehension of another capital felon or testified truthfully on behalf of the prosecution in another prosecution of a felony." N.C.G.S. § 15A-2000(f)(8) (1999). During defendant's sentencing proceeding, he called as a witness Robert Martin, a former prosecutor with the Alamance County District Attorney's Office. Martin testified that in 1994 he prosecuted a case against Glen Farrar, who had been charged with assault with a deadly weapon with intent to kill inflicting serious injury. Defendant testified for the State, and Farrar was convicted and sentenced to twenty years' imprisonment. Martin stated that defendant's testimony was helpful to the State. After Martin testified, defendant and the State stipulated that Farrar had been charged and convicted of a felony.

Defendant thereafter filed a written request that the trial court submit the (f)(8) statutory mitigating circumstance to the jury; defendant also requested that the trial court instruct peremptorily as to this circumstance. The trial court agreed to submit the (f)(8) circumstance, but refused to give a peremptory instruction, stating that it was "[f]or the jury to say whether or not [defendant] testified truthfully." Defendant objected, and the trial court gave a nonperemptory instruction. Defendant renewed his objection at the close of the trial court's charge to the jury. Subsequently, one or more jurors found the circumstance to exist.

We have held that " '[u]pon request, a trial court should give a peremptory instruction for any mitigating circumstance, whether statutory or nonstatutory, if it is supported by uncontroverted evidence.' " *State v. Golphin*, 352 N.C. at 474, 533 S.E.2d at 239 (quoting *State v. Wallace*, 351 N.C. 481, 525-26, 528 S.E.2d 326, 354, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000)). The State now argues that because there was no evidence that defendant testified truthfully at Farrar's trial, the trial court correctly refused to give defendant's requested peremptory instruction. However, the State presented no evidence at trial to contradict defendant's evidence on this circumstance, nor does it argue on appeal that any such evi-

dence was presented. *See State v. Holden*, 338 N.C. 394, 402, 450 S.E.2d 878, 882 (1994). The State relied on defendant's testimony at Farrar's trial, and under the North Carolina Rules of Professional Conduct, "[a] lawyer shall not . . . counsel or assist a witness to testify falsely." Rev. R. Prof. Conduct N.C. St. B. 3.4(b) (Fairness to opposing party and counsel), 2001 Ann. R. (N.C.) 623. The evidence of defendant's truthful testimony is both uncontroverted and credible, and " '[w]here . . . all of the evidence in [a capital prosecution], if believed, tends to show that a particular mitigating circumstance does exist, the defendant is entitled to a peremptory instruction on that circumstance.' " *State v. Holden*, 338 N.C. at 402-03, 450 S.E.2d at 882 (quoting *State v. Johnson*, 298 N.C. 47, 76, 257 S.E.2d 597, 618 (1979)) (second alteration in original). Consequently, if similar evidence is presented at defendant's resentencing proceeding, the trial court should give a peremptory instruction on this statutory mitigating circumstance.

Defendant also contends that the trial court erred in allowing the prosecutor to make grossly improper closing arguments during the sentencing phase of trial. We held above in our review of the guilt-innocence phase of defendant's trial that the trial court did not err by failing to intervene *ex mero motu* when the prosecutor recited the "Dance, Death" poem during closing argument. At defendant's capital sentencing proceeding, the prosecutor again read this poem to the jury, but added the following italicized words at the conclusion:

The date has been set. God knows the hour. *Let the Judge set the date. The death penalty is the only appropriate punishment in this case for what Willie Lloyd did to Catherine Woods.*

(Emphases added.)

Despite our oft-repeated distaste for biblical references in argument, we reluctantly held above that the recitation of the poem without the italicized language did not require intervention by the trial court. This additional language, however, crosses the line into impropriety by linking the law enforcement powers of the State, and specifically the judge, to divine powers of God. We admonish the State against making such arguments at defendant's new sentencing proceeding.

Finally, defendant contends that the trial court erred in allowing the prosecutor to argue to the jury during sentencing closing arguments:

> Justice is in your laps. Your voice is the conscience of this com-
> munity. . . . In all respects, you are the last link in the State's chain
> of law enforcement. . . . The officers can do no more, the State of
> North Carolina, the District Attorney's Office can do no more. It's
> in your laps.

Although defendant objected to this argument, the trial court over-
ruled the objections and instructed the jury as follows:

> Ladies and gentlemen, counsel has an opportunity to argue
> their contentions and their positions. And this is not evidence,
> and this is not your instructions on the law. You've heard the evi-
> dence, and I will give you the instructions on the law.
> Nevertheless, the attorneys do have the opportunity to argue
> their positions and their contentions in this matter.

Defendant renewed his objections at the close of the State's argument
and moved for a mistrial. The trial court again overruled defendant's
objections and denied his motion.

We have held that "[t]o suggest that the jury is effectively an arm
of the State in the prosecution of the defendant or that the jury is the
last link in the State's chain of law enforcement is improper." *State v.
Elliott*, 344 N.C. at 285, 475 S.E.2d at 222-23 (trial court not required
to intervene *ex mero motu* when defendant failed to object to argu-
ment that jury was last link in the State's chain of law enforcement);
*see also State v. Brown*, 320 N.C. 179, 203, 358 S.E.2d 1, 18, *cert.
denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). Accordingly, we ad-
monish the State against making this argument at defendant's new
sentencing proceeding.

In conclusion, we find no prejudicial error in the guilt-innocence
phase of defendant's capital trial, but we vacate the death sentence
and remand for a new capital sentencing proceeding.

GUILT-INNOCENCE PHASE: NO PREJUDICIAL ERROR.

SENTENCING   PHASE:   DEATH   SENTENCE   VACATED;
REMANDED FOR NEW CAPITAL SENTENCING PROCEEDING.