An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 25-424

Filed 20 May 2026

Polk County, No. 18JA000021-740

IN THE MATTER OF: G.C.C.

Appeal by Respondent-Respondent-Mother from Order entered 4 February 2025 by Judge Kimberly Gasperson-Justice in Polk County District Court. Heard in the Court of Appeals 28 January 2026.

*Parent Defender Annick Lenoir-Peek for Respondent-Appellant Mother.*

*Hanna Honeycutt Frost for Petitioner-Appellee Polk County Department of Health and Human Services.*

*Matthew D. Wunsche for Guardian ad Litem.*

HAMPSON, Judge.

**Factual and Procedural Background**

Respondent-Mother appeals from an Order following a permanency planning

review hearing awarding guardianship of her son Connor[1] to Connor's foster parents. The Record below tends to reveal the following:

Connor was born in 2014, and his sister Brooke was born in 2011. In August 2018, Respondent-Mother was arrested for driving while impaired and possession of methamphetamine while both children were in the vehicle. The children at that time lived with Respondent-Mother and her boyfriend, Erik Kassell. DSS investigation revealed the children had access to drugs and an unsecured firearm in the home, and a drug screen of Connor came back positive for methamphetamine. The investigation also revealed domestic violence between Respondent-Mother and the children's father, as well as between Respondent-Mother and Kassell. Brooke reported she had been sexually abused by Kassell.

In October 2018 the trial court adjudicated Connor and Brooke neglected and dependent. The trial court ordered both parents submit to drug screenings, obtain substance abuse and mental health assessments, meet with DSS, maintain employment, and attend supervised visits. In its Disposition Order, the trial court ordered a primary permanent plan of reunification and a concurrent plan of guardianship with an approved caretaker or relative. The children were placed with a foster family, and Respondent-Mother was allowed weekly unsupervised visits with

---

[1] We use pseudonyms to protect the identities of minor children.

Connor.[2]

Following the first permanency planning review hearing, held in August 2019, the trial court found Respondent-Mother was actively working on her case plan and had completed a parenting class, substance abuse assessment, and substance abuse treatment. It also found Respondent-Mother had remained sober for nearly a year but had recently relapsed and requested DSS help her gain admission to a residential treatment program. DSS noted concerns for the children's safety because Respondent-Mother remained in contact with Kassel despite informing DSS that she had not. Respondent-Mother was pregnant with Kassel's child at the time. The trial court concluded it was contrary to the welfare of the juveniles to return to the home of either parent at the time, and it continued to order a primary plan of reunification with Respondent-Mother. It also ordered Respondent-Mother's visitation with the children be supervised.

Prior to the second review hearing, held in January 2020, Connor informed DSS he had been sexually abused by Brooke, and later by Kassel and Respondent-Mother. DSS referred Connor to sexual abuse specific therapy and recommended Respondent-Mother receive treatment to address her own history of trauma and sexual abuse. Following a visit with Respondent-Mother, Connor reported to his

---

[2] Father did not substantially participate in family court proceedings or in completing his case plan, and the trial court ultimately concluded reunification efforts would be futile. His parental rights to both children were terminated in April 2021.

foster parents he was upset because Respondent-Mother told him he needed to stop lying about her and to stop telling lies.

Respondent-Mother began attending a residential treatment program in August 2019 to address her drug relapse and mental health. She was discharged from that program after becoming uncooperative, combative, and aggressive toward facility staff. In October 2019 she gave birth to her and Kassel's son. DSS reported observing her car parked on multiple occasions at Kassel's home. At the second review hearing, the trial court found Respondent-Mother had improved from previous hearings, was maintaining housing, attending visitation, and participating in group therapy, counseling, and addiction recovery meetings. She had not engaged in any services DSS had recommended regarding trauma and sexual abuse. It also found Connor had developed a strong bond with his foster family.

In October 2019 Respondent-Mother began staying in a second residential program, but she did not successfully complete the program and was discharged in May 2020. Following the third review hearing, the trial court found her progress on her case plan had stalled over the preceding months, she again had not engaged in any services to address her history of trauma and sexual abuse, and she had failed to submit requested drug screens. It found the juveniles were doing well in their respective placements and, though Respondent-Mother exercised visitation, she also made inappropriate comments which upset Connor. It found Respondent-Mother had acted inconsistently with her constitutionally protected parental rights and ordered

the children's primary permanent plan be changed to adoption with a concurrent plan of guardianship.

In October 2020 DSS filed a Motion to terminate Respondent-Mother's and Father's parental rights. It voluntarily dismissed the Motion as to Respondent-Mother in March 2021. DSS developed a new case plan with Respondent-Mother. At the March 2021 review hearing, the trial court found Respondent-Mother was employed, had been maintaining stable housing with appropriate bedrooms for the juveniles, tested negative for substances, and regularly attended trauma-focused therapy as well as therapy to address domestic violence. It found it was possible that Brooke could be returned to Respondent-Mother's home within the next six months, but that it was unknown if Connor could because of escalating challenges in his school setting. At DSS's recommendation, the trial court changed the permanent plan from termination to reunification with Respondent-Mother, with a concurrent plan of adoption. It ordered Respondent-Mother to continue following her DSS case plan and to "take ownership for [the children's] history of abuse/neglect at a time deemed appropriate and emotionally safe."

Following the March 2021 Order, Respondent-Mother continued to make progress in her case plan. She maintained stable housing and employment and tested negative for substances. The trial court continued to order reunification as the primary permanent plan. Respondent-Mother began family therapy with Brooke in April 2021, and Brooke was returned to her custody in December 2022.

Connor has displayed recurring behavioral issues during the pendency of his case, including becoming violent at school. He consistently reported his experiences of sexual and physical abuse while he lived with Respondent-Mother. Connor's individual therapy has progressed slowly. He stated he did not want to participate in therapy that appeared directed toward reunification with Respondent-Mother, and he has consistently expressed his desire to remain with his foster family.

Connor has also expressed he does not want visitation with Respondent-Mother. During visits, Connor has often requested to end sessions early and became agitated when they did not. His behavioral problems in school worsened after returning to in-person visitation and with increased visitation. The trial court in June 2022 ordered Respondent-Mother pursue family therapy with Connor, while acknowledging the assertion by Connor's therapist that family therapy would lead to additional trauma. Several providers declined to provide therapy, and the trial court again in April 2023 directed DSS to locate family counseling services in order that progress toward reunification could be made.

During family therapy, Respondent-Mother apologized to Connor for "what you think happened to you." Respondent-Mother expressed her opinion on multiple occasions, including through testimony to the trial court, that DSS and Connor's foster mother had "brainwashed" Connor and turned him against her. A parenting capacity assessment indicated Respondent-Mother had not taken responsibility for DSS becoming involved with her children or Connor's subsequent trauma. She has

accused Connor of lying about his experiences and expressed that she "could care for Connor if he changed, Connor is the one tearing the family apart."

In February 2024 the trial court ordered visitation be discontinued. Following this, Connor's behavior in school improved. Respondent-Mother stopped cooperating with DSS, including canceling a home visit and refusing to provide her home address because she did not want to be "stalked." DSS also could not verify Respondent-Mother's employment.

During the November 2024 review hearing, DSS recommended Connor's permanent plan be changed to guardianship. The trial court, by Order entered 4 February 2025, concluded it was in Connor's best interest that his permanent plan be changed to guardianship with a secondary plan of reunification. It awarded guardianship to Connor's foster parents. It also ordered Respondent-Mother could have supervised visitation with Connor only upon recommendation of Connor's therapist. Respondent-Mother appeals from this Order.

## Issues

The issues on appeal are whether: (I) the trial court erred by awarding guardianship to the foster parents without first finding Respondent-Mother was unfit to have custody or her conduct was inconsistent with her constitutionally protected status; (II) Respondent-Mother's trial counsel was ineffective in failing to raise the issue of Respondent-Mother's constitutionally protected status; (III) the trial court erred in concluding guardianship was in Connor's best interest and awarding

guardianship to the foster parents; and (IV) the trial court erred by ordering supervised visitation without specifying a minimum frequency and length of visits or addressing Respondent-Mother's ability to pay for supervision.

## **Analysis**

I.   Constitutionally Protected Status

Respondent-Mother first argues the trial court violated her constitutional right to parent by awarding guardianship of Connor to the foster parents without first finding she is unfit or has acted inconsistently with her constitutionally protected status.

Parents have a "constitutionally-protected paramount right to custody, care, and control of their child[.]" *Petersen v. Rogers,* 337 N.C. 397, 400, 445 S.E.2d 901, 903 (1994). Accordingly, when a parent and non-parent dispute the custody of a child, we presume if "parents perform their obligations to their children," they possess a "prior right to custody." *Id.* at 403, 445 S.E.2d at 904.[3] However, this presumption is not absolute, and a parent may lose the right to custody when the State shows "the parent is unfit to have custody or where the parent's conduct is inconsistent with his or her constitutionally protected status." *In re E.B.,* 375 N.C. 310, 315, 847 S.E.2d 666, 670 (2020). The trial court must make this finding based on evidence in the

---

[3] The trial court's Order awarding guardianship of Connor to his foster parents represents a change in custody because an award of general guardianship entitles the guardian to custody of the child. *Corbett v. Lynch,* 251 N.C. App. 40, 42, 795 S.E.2d 564, 565 (2016); N.C. Gen. Stat. § 35A-1241(a)(1) (2025).

record before determining it is in the child's best interest to award guardianship to a nonparent over a parent. *Price v. Howard,* 346 N.C. 68, 79, 484 S.E.2d 528, 534 (1997).

In this case, the trial court did not find Respondent-Mother was unfit or her conduct was inconsistent with her constitutionally protected status. However, Respondent-Mother did not raise this issue before the trial court. In general, constitutional arguments cannot be made for the first time on appeal. *State v. Lloyd,* 354 N.C. 76, 86-87, 552 S.E.2d 596, 607 (2001). Regarding the constitutionally protected status of parents, our Supreme Court has expressly held "a parent's argument concerning his or her paramount interest to the custody of his or her child, although afforded constitutional protection, may be waived on review if the issue is not first raised in the trial court." *In re J.N.,* 381 N.C. 131, 133, 871 S.E.2d 495, 497-98.[4] As Respondent-Mother did not raise the issue of her constitutionally protected status before the trial court, she has waived that issue and cannot advance it for the first time on appeal.

## II. Ineffective Assistance of Counsel

---

[4] Prior to direction from our Supreme Court on this question, we have held a parent who did not expressly invoke the constitutional argument in the trial court could preserve the argument by opposing a grant of custody. *See, e.g., In re B.R.W.,* 278 N.C. App. 382, 399, 863 S.E.2d 202, 215 (2021) (parents preserved constitutional argument by presenting evidence regarding their ability to care for their child and opposing the DSS recommendation of guardianship) (overruled by *In re K.C.,* 386 N.C. 690, 909 S.E.2d 170 (2024)). Our Supreme Court has clarified "a parent who merely argues against a child's removal, or against the child's placement with someone else, does not adequately preserve the constitutional issue. To preserve it, the parent must inform the trial court and the opposing parties that the parent is challenging the removal on constitutional grounds and articulate the basis for the constitutional claim." *K.C.,* 386 N.C. at 697-98, 909 S.E.2d at 175.

Respondent-Mother argues her trial counsel provided ineffective assistance of counsel by failing to raise the constitutional argument before the trial court.

A parent is entitled to counsel in cases involving allegations of abuse, neglect, or dependency. N.C. Gen. Stat. § 7B-602(a) (2025). This statutory right to counsel includes a right to the effective assistance of counsel. *In re T.N.C.,* 375 N.C. 849, 854, 851 S.E.2d 29, 32 (2020). To prevail on a claim of ineffective assistance of counsel, Respondent-Mother must show: (1) counsel's performance was deficient; and (2) the deficiency was so serious as to deprive her of a fair hearing. *In re B.P.,* 169 N.C. App. 728, 733, 612 S.E.2d 328, 331 (2005).

Respondent-Mother argues her trial counsel's failure to preserve the constitutional issue constitutes per se deficient performance. However, assuming her counsel's performance was objectively unreasonable, she must also demonstrate prejudice: a "reasonable probability that counsel's deficient performance led to a different result in the proceedings." *In re N.N.,* 296 N.C. App. 159, 169, 907 S.E.2d 430, 439 (2024). Respondent-Mother does not in her principal brief indicate how she was prejudiced by her attorney's allegedly deficient performance, nor does she allege that she was prejudiced at all. "Issues not presented and discussed in a party's brief are deemed abandoned." N.C. R. App. P. 28(a) (2025). Respondent-Mother does argue in her reply brief that she was prejudiced, but appellants may not raise new arguments for the first time in their reply briefs. *State v. Triplett,* 258 N.C. App. 144, 147, 810 S.E.2d 404, 407-08 (2018) ("Defendant may not use his reply brief to make

new arguments on appeal. A reply brief is not an avenue to correct the deficiencies contained in the original brief."). Because Respondent-Mother has failed on appeal to allege one of the elements of her claim for ineffective assistance of counsel, she has abandoned that claim. *See State v. Maready,* 205 N.C. App. 1, 15, 695 S.E.2d 771, 781 (2010).

Additionally, the trial court made sufficient findings of facts to support a determination that Respondent-Mother's conduct was inconsistent with her constitutionally protected status. In her reply brief, Respondent-Mother argues the findings of fact demonstrate otherwise, specifically noting the trial court's findings regarding her progress:

> 58.  That while the trial court is very frustrated that the child has made no progress toward being reunified with his Respondent-Mother during the last six years, the court finds that DSS has made reasonable efforts to prevent or eliminate the need for placement with the Department and to reunify this family, including engaging the juveniles in services, having regular CFT meetings, working with the therapists to meet the needs of the juveniles and assisting in contact between the family and complied with all the Orders of this Court.

> 59.  Although the Respondent-Mother did complete her plan and has worked hard to achieve reunification with [Connor], this child has not recovered emotionally from the abuse he suffered at the hands of his parents, and it is in his best interest, given his fragile state and strong desire to say with his foster parents, that guardianship be granted at this time to the [foster parents] as it is there that he feels safe at this time.

However, the fact that Respondent-Mother has displayed positive conduct does not indicate she has not also engaged, and continues to engage, in conduct inconsistent with her protected status. *See In re J.M.,* 271 N.C. App. 186, 194, 843 S.E.2d 668, 674 (2020). The trial court made several findings regarding Respondent-Mother's failure to take responsibility for Connor's trauma:

> 13. Respondent-Mother . . . informed [Connor's therapist] several times that the foster mother repeatedly brainwashed [Connor] into believing a narrative that did not happen. She also stated that the agency and foster mother had turned "my son against me." She yelled at Social Worker Condrey to be quiet and to leave the office.

> 18.(h) Following the visit on November 13, 2023, Respondent-Mother again asked to speak to Social Worker Condrey. Her voice became elevated, and she called Social Worker Condrey a "sick human being." Once outside she stated that the Agency had been telling lies and that the foster mother was brainwashing Chase against her.

> 35. A Parenting Capacity Assessment was completed by Respondent-Mother through Crossroads Counseling Center in Hickory. The clinician indicated that she often refused to answer questions and stated that the foster mother was brainwashing [Connor]. Due to Respondent-Mother's refusal to be forthcoming with information needed to accurately assess her current understanding and abilities, the clinician was not able to offer a specific diagnosis following completion of the assessment.

> 38. Respondent-Mother does not acknowledge that [Connor's] trauma occurring while in her care has resulted in his current mental health struggles.

42. When Respondent-Mother was informed of the Agency's decision to ask for a change of plan, Respondent-Mother sent text messages to the foster Rmother stating her disapproval of the change. She has repeatedly stated that [Connor] has been "brainwashed" by the foster mother, and that DSS has actively tried to turn [Connor] against her. Her testimony in court was to the same effect.

Respondent-Mother does not contest these findings of fact, and they are therefore binding on appeal. *In re S.D.J.,* 192 N.C. App. 478, 485, 665 S.E.2d 818, 823 (2008).

"A trial court's finding that a parent is unfit will be affirmed on appeal if we conclude that the finding is supported by clear and convincing evidence." *J.M.,* 271 N.C. App. at 193, 843 S.E.2d at 674. These findings regarding Respondent-Mother's continuing failure to acknowledge her role in the harm done to Connor would support a finding that her conduct was inconsistent with her constitutionally protected right. She cannot demonstrate there is a reasonable probability that, but for her counsel's failure to raise the constitutional issue, the trial court proceedings would have had a different result. *N.N.,* 296 N.C. App. at 169, 907 S.E.2d at 439.

III.    Conclusions of trial court

Respondent-Mother argues the trial court erred by concluding guardianship was in Connor's best interest and awarding guardianship to his foster parents. We review a permanency planning order to determine whether there is competent evidence in the record to support the trial court's findings and whether the findings

support the conclusions of law. *In re J.V.,* 198 N.C. App. 108, 112, 679 S.E.2d 843, 845 (2009).

During a permanency planning hearing, the trial court must determine "the best permanent plans to achieve a safe, permanent home for the juvenile within a reasonable period of time." N.C. Gen. Stat. § 7B-906.1(g). "In choosing an appropriate permanent plan under N.C. Gen. Stat. § 7B–906., the juvenile's best interests are paramount. We review a trial court's determination as to the best interest of the child for an abuse of discretion." *In re J.H.*, 244 N.C. App. 255, 269, 780 S.E.2d 228, 238 (2015) (internal quotation omitted). The trial court also addresses the child's placement and may maintain that placement or order a different placement, including appointing a guardian. N.C. Gen. Stat. § 7B-906.1(d1). When the juvenile is not placed with a parent, the trial court must consider and make written findings regarding "whether it is possible for the juvenile to be placed with a parent within the next six months and, if not, why such placement is not in the juvenile's best interests." *Id.* § 906.1(e)(1).

Here, the trial court concluded:

> 2.     The conditions that led to the custody of the juvenile
>        by Polk County DSS and removal from the home of
>        the Respondent-Mother continue to exist and it is
>        unlikely that the juvenile could be returned to the
>        home of Respondent-Mother within the next six
>        months.

Accordingly, it further concluded it was in Connor's best interest that the primary

permanent plan be changed to guardianship, with a secondary plan of reunification, and it awarded legal guardianship to the foster parents.

In support of its conclusions, the trial court found the following unchallenged findings of fact:

> 9.    (c) Dr. Powell stated that the juvenile has stated adamantly that he does not want to return home or engage in visitations with his mother. The juvenile also does not want to engage in family sessions with his mother. The juvenile's "truth" regarding his traumatic experiences have always remained consistent and none of the details have changed throughout the sessions.
>
> (d) Dr. Powell also stated that Respondent-Mother continued to dispute the statements that Connor had made regarding his abuse.
>
> (g) The first [family therapy] session took place on June 14, 2023. [Conor] continued to state that he did not want to engage in sessions with Respondent-Mother. When told that the session would give Respondent-Mother a chance to apologize, he stated, "How can she apologize when she won't even admit what she did?"
>
> (h) The session lasted approximately 20 minutes. Respondent-Mother apologized to [Connor] for "What you think happened to you." [Connor] adamantly stated that he does not want to leave the home of the foster parents. Respondent Respondent-Mother responded, "I don't want to take you from them, I just want to be part of your life."
>
> 13.   Respondent-Mother . . . informed [Connor's therapist] several times that the foster mother repeatedly brainwashed [Connor into believing a narrative that did not happen. She also stated that

the Agency and foster mother had turned "my son against me." She yelled at Social Worker Condry to be quiet and to leave the office.

17. Visitation between [Connor] and mother has occurred throughout the life of this case until they were discontinued on February 13, 2024. The supervised visits were problematic and difficult with [Connor] vehemently opposed to the visits and disrupting the same. Most visitations ended with [Connor] running from the visit room.

20. [Connor] has been clear with Social Worker Condrey, his foster family, his Guardian ad litem and his counselor that he does not want to engage in any visitation with Respondent-Mother. He continued to ask for the ability to speak to a judge so that he can state that it is his hope to remain with his foster family.

23. The juvenile attends Tryon Elementary School and is currently in the 4th grade. He has an IEP in school based on "other health impairment due to symptoms exhibited as a result of ADHD and PTSD. The school staff reported that many of [Connor's] behaviors and movements are a result of trauma responses.

28. On May 23, 2024, Ms. Edwards reported that [Connor's] behavior had improved since visitation had been discontinued. He was able to make it through the school day and was able to join fun time in school.

30. Polk County DSS attempted to complete a home visit on October 27, 2023, on a date that had been agreed upon by Respondent-Mother, but [Respondent-Mother] cancelled on October 26, 2023. A home visit has not been conducted since that time.

31. On February 12, 2024, Respondent-Mother would not provide her address stating the Agency would have to contact her attorney for the information. The

Agency is unable to verify her living arrangements.

33.    The current employment of Respondent-Mother has also not been verified by the Agency.

35.    A Parenting Capacity Assessment was completed by Respondent-Mother through Crossroads Counseling Center in Hickory. The clinician indicated that she often refused to answer questions and stated that the foster mother was brainwashing [Connor]. Due to Respondent-Mother's refusal to be forthcoming with information needed to accurately assess her current understanding and abilities, the clinician was not able to offer a specific diagnosis following completion of the assessment.

38.    Respondent-Mother does not acknowledge that [Connor's] trauma occurring while in her care has resulted in his current mental health struggles. Ms. Lookadoo does not feel that Respondent-Mother is ready to take responsibility for her own actions and needs seek therapeutic services to work though the anger she exhibits.

42.    When Respondent-Mother was informed of the Agency's decision to ask for a change of plan, Respondent-Mother sent text messages to the foster mother stating her disapproval of the change. She has repeatedly stated that [Connor] has been "brainwashed" by foster mother . . . and that DSS has actively tried to turn [Connor] against her. Her testimony in court was to the same effect.

50.    [Connor] continues to adamantly state that he does not want to return to Respondent-Mother's home, that she was mean and did inappropriate things.

51.    [Connor] testified all visits were bad. He was angry before and after visits and is still angry.

56.    [Connor] has been in foster care for six years now and he is more estranged from his mother than ever.

Whatever the cause of his emotional/mental health trauma, he attributes it to his mother's treatment of him and it is going to take possibly years for that estrangement to disappear.

57. DSS recommended that [Connor] remain in his current placement at this time. His behaviors are being effectively managed at the family foster home level and he is receiving the medical and mental health services that he needs. Any change in placement at this time would be detrimental to [Connor].

59. Although the Respondent-Mother did complete her plan and has worked hard to achieve reunification with Connor, this child has not recovered emotionally from the abuse he suffered at the hands of his parents[.]

Respondent-Mother does not challenge these findings, and they are therefore binding on this Court. *S.D.J.,* 192 N.C. App. at 485, 665 S.E.2d at 823. In summary, the trial court found Connor is still suffering from trauma he experienced while living with Respondent-Mother, contact with Respondent-Mother upsets him and negatively influences his behavior, Respondent-Mother has not taken accountability for her role in the harm caused to Connor, and that this dynamic has not significantly improved after six years in foster care.

Respondent-Mother primarily argues her progress in her case plan and the fact that she is currently caring for her two other children demonstrate she has remedied the conditions that led to Connor's removal and is able to provide appropriate care. Respondent-Mother has addressed her issues with substance abuse and domestic

violence and maintained stable housing and employment. However, assuming Respondent-Mother's home is an adequate environment for children, as it appears to be, Respondent-Mother has not shown the trial court abused its discretion by determining guardianship was in Connor's best interest. Regardless of Respondent-Mother's progress and her relationships with her other children, the trial court's findings support its conclusion that returning Connor to Respondent-Mother's custody would be against his best interests, that it is unlikely he could be returned to Respondent-Mother's custody within the next six months, and that guardianship is the best option to provide a degree of permanence. *See, e.g., In re L.M.,* 238 N.C. App. 345, 349, 767 S.E.2d 430, 434-35 (2014) (trial court did not abuse discretion in determining guardianship was in child's best interests when, despite Respondent-Mother's progress, evidence supported findings foster father was actively involved in child's life and returning child home would be contrary to his welfare). The trial court did not abuse its discretion in awarding guardianship of Connor to the foster parents.

IV.   Visitation

The trial court ordered:

> Respondent-Mother may have supervised visitation with the juvenile, [Connor], to be supervised at the Mediation Center in Hendersonville or with his licensed therapist in sessions, only upon recommendation of [Connor's] therapist.

Respondent-Mother argues, and DSS concedes, this is an impermissible delegation of judicial authority by the trial court. We agree. Because the order

provided for visitation, the trial court was required to "specify the minimum frequency and length of the visits and whether the visits shall be supervised." N.C. Gen. Stat. § 7B-905.1(d). Additionally, a dispositional order which provides for supervised visitation must make findings about the parent's ability to pay for supervision. *In re J.T.S.,* 268 N.C. App. 61, 74, 834 S.E.2d 637, 646-47 (2019). Because the Order in this case fails to specify a minimum frequency and length of visits and does not address Respondent-Mother's ability to pay for supervised visitation, we vacate the portion of the permanency planning order regarding visitation and remand for additional findings of fact addressing the minimum frequency and length of visits, whether Respondent-Mother is to bear any costs associated with conducting supervised visitation and, if so, whether Respondent-Mother has the ability to pay those costs. *In re Y.I.,* 262 N.C. App. 575, 582, 822 S.E.2d 501, 506 (2018).[5]

## **Conclusion**

For the foregoing reasons, we vacate the trial court's Order and remand for the limited purpose of specifying a minimum length and frequency for visitation and

---

[5] Respondent-Mother additionally argues the trial court's order that visitation be granted "only upon recommendation of [Connor's] therapist" represents an impermissible delegation of the trial court's authority. *Custodians* may not be awarded the discretion to determine visitation because "[u]sually those who are involved in a controversy over the custody of a child have been unable to come to a satisfactory mutual agreement concerning custody and visitation rights." *In re Custody of Stancil Children,* 10 N.C. App. 545, 552, 179 S.E.2d 844, 859 (1971). Whether a similar grant to a therapist is impermissible is less clear, and we have held, albeit in an unpublished opinion, that an order which specifies minimum visitation may award discretion to a child's therapist to determine additional visitation. *In re S.W.,* 292 N.C. App. 110, 895 S.E.2d 629 (2024) (unpublished). Because we vacate and remand to allow the trial court to set minimum visitation, we do not reach this question.

addressing the cost of supervision. We otherwise affirm.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

Judges GORE and GRIFFIN concur

Report per Rule 30(e).